Jim Inskeep
February 23, 2021

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTH DISTRICT OF INDIANA
CAUSE NO. 1:20-cv-00320-JMS-DML


GABRIELA NIEVES,                        )
                                        )
            Plaintiff,                  )
                                        )
vs.                                     )
                                        )
CARMEL CLAY SCHOOLS, CHRIS              )
PLUMB, JOHN GOELZ, AND RED ROOF         )
INN,                                    )
                                        )
            Defendants.                 )



        The videotaped deposition by Zoom of
     JIM INSKEEP, a witness who appeared remotely
     before me, Valerie Fillenwarth, RPR, a Notary
     Public in and for the County of Johnson, State
     of Indiana, taken on behalf of the Plaintiff,
     with all parties appearing via Zoom, taken on
     February 23, 2021, commencing at 10:00 a.m.
     EST, pursuant to all applicable rules, with
     Notice as to the time and place thereof.




            FILLENWARTH REPORTING SERVICE
                775 Hummingbird Lane
                Whiteland, IN 46184
                  (317) 345-6179
               vfillenwarth@gmail.com

Jim Inskeep
February 23, 2021

```
                                                    2
 1           A P P E A R A N C E S
 2
     FOR THE PLAINTIFF:
 3        Mr. Jonathan C. Little
          Ms. Gaby Olshemski
 4        SAEED & LITTLE, LLP
          133 W. Market Street, #189
 5        Indianapolis, IN 46202
          317.721.9214 (Phone)
 6        jon@sllawfirm.com
          gaby@sllawfirm.com
 7
 8
 9   FOR THE DEFENDANT CARMEL CLAY SCHOOLS:
          Ms. Jessica Williams Schnelker
10        CHURCH CHURCH HITTLE & ANTRIM
          10765 Lantern Road, Suite 201
11        Fishers, IN 46038
          317.773.2190 (Phone)
12        jschnelker@cchalaw.com
13
14
     ALSO PRESENT:
15        Pete Zinkan, Videographer
16
17
18
19
20
21
22
23
24
25
```

```
                                                    3
 1    I N D E X   O F   E X A M I N A T I O N
 2
                                         Page
 3   DIRECT EXAMINATION...................    5
          Questions by Mr. Jon Little
 4
 5
 6
       I N D E X   O F   E X H I B I T S
 7
                                         Page
 8   Deposition Exhibit No.:
 9   1-  1/28/19 e-mail...................   30
          (DEFT RESP0004607)
10
     2-  6/20/17 e-mail string............   38
11        (DEFT RESP0001807)
12   3-  12/04/18 e-mail string...........   40
          (DEFT RESP0003906-3907)
13
     4-  12/12/17 e-mail.................     42
14
     5-  12/06/16 e-mail string...........   47
15        (DEFT RESP0003036-3037)
16   6-  1/5/17 e-mail...................    50
          (DEFT RESP0002202)
17
     7-  1/14/17 e-mail...................   50
18        (DEFT RESP0002175)
19   8-  Newspaper Article................   59
          (DEFT RESP006591)
20
21
22
23
24
25
```

```
                                                    4
 1        THE VIDEOGRAPHER:  Good morning.  This is
 2   the videographer.  We are going on the record
 3   at 9:59 a.m.
 4        Today's date is February 23rd of 2021.
 5   Here begins the video deposition of Jim Inskeep
 6   being taken by counsel for the plaintiff.  The
 7   caption in this case is Nieves vs. Carmel Clay
 8   Schools, et al.  The case is filed in the
 9   United States District Court for the Southern
10   District of Indiana.  This deposition is being
11   held remotely.
12        My name is Peter Zinkan, the
13   videographer, and the court reporter is Valerie
14   Fillenwarth.
15        At this time the attorneys may state
16   their appearance for the record, whom they
17   represent, and the court reporter will give the
18   oath.
19        MR. LITTLE:  Sure.  Jon Little for
20   plaintiff.
21        MS. SCHNELKER:  Jessica Schnelker for
22   Carmel Clay Schools.
23        MS. OLSHEMSKI:  Gaby Olshemski for
24   plaintiff, Gabriela Nieves.
25
```

```
                                                    5
 1            JIM INSKEEP,
 2   having been first duly sworn to tell the truth,
 3   the whole truth, and nothing but the truth,
 4   testified as follows:
 5   DIRECT EXAMINATION,
 6   QUESTIONS BY MR. JONATHAN LITTLE:
 7   Q.  All right.  Sir, could you state and spell your
 8       name for the record, please?
 9   A.  Yes.  Jim Inskeep, J-I-M, I-N-S-K-E-E-P.
10   Q.  Okay.  And, Mr. Inskeep, how are you currently
11       employed?
12   A.  I am the athletics director at Carmel High
13       School of Carmel Clay Schools.
14   Q.  Okay.  And how long have you been the athletic
15       director at the Carmel?
16   A.  This is my 20th year in this position.
17   Q.  Okay.  And before -- so that's 2001 you became
18       the athletic director?
19   A.  Yes, sir.
20   Q.  Okay.  And before that, how were you employed?
21   A.  I've been with Carmel Clay Schools my entire
22       career, dating back to 1997; first as a teacher
23       and coach at Carmel Junior High; and then a
24       year as the assistant athletic director in
25       2000-2001.
```

2 (Pages 2 to 5)

Fillenwarth Reporting Service
317.345.6179

Jim Inskeep
February 23, 2021

6

1  Q.  Okay.  When you started in 1997, who was your
2      supervisor?
3  A.  My supervisor at that time was
4      Principal Charles Scott.
5  Q.  Okay.  And who was the head athletic director?
6  A.  At that time, it would have been Lee Lonso, I
7      believe.
8  Q.  Okay.  And when did Mr. Lonso retire?
9  A.  He switched roles after the '97 school year,
10     '96, '97.
11 Q.  What did he switch roles to do?
12 A.  He moved from athletics director to assistant
13     principal.  And I was in another building in
14     the district at that time and not coaching at
15     Carmel High School.
16 Q.  Okay.  Were you coaching -- did you coach at
17     Carmel High School?
18 A.  No.
19 Q.  Oh, okay.  So after Mr. Lonso became assistant
20     principal, who was the next head athletic
21     director?
22 A.  Bobby Cox served from 1997 to 2000 for school
23     years.
24 Q.  Okay.  Why did Mr. Cox leave Carmel?
25 A.  He left to take the assistant commissioner

7

1      position at the Indiana High School Athletic
2      Association.
3  Q.  Was he fired or did he leave voluntarily?
4  A.  No, he left voluntarily, to my knowledge.
5  Q.  Okay.  And then you became the athletic
6      director after that?
7  A.  I was the assistant athletic director for a
8      year.  And the athletic director at that time,
9      we were in interim positions, was Bruce Wolf.
10 Q.  Why did Mr. Wolf leave Carmel?
11 A.  He did not.  We switched roles after one year
12     and he retired from Carmel Clay Schools this
13     past school year in 2020.
14 Q.  So he became your boss and then you became his
15     boss?
16 A.  Correct.
17 Q.  Okay.  And before 1997, what -- did you go to
18     college or what was the --
19 A.  Yes, I was a student at Purdue University from
20     '92 to '96.
21 Q.  Okay.  Did you play any sports or anything at
22     Purdue?
23 A.  I did not.
24 Q.  Okay.  And you went to Carmel High School?
25 A.  Yes, sir, graduated in 1992.

8

1  Q.  Okay.  Now I notice -- is your dad or uncle,
2      was he an athletic director at Carmel?
3  A.  No.
4  Q.  No.  There was another Inskeep I saw going
5      through the records.  Who is that?
6  A.  My father was athletic director at North
7      Central High School from 1971 --
8  Q.  Okay.
9  A.  -- to 1994.
10 Q.  Okay.  But he lived, obviously, in Carmel since
11     you went to Carmel?
12 A.  Yes.
13 Q.  Oh, okay.  But your dad never was athletic
14     director at Carmel?
15 A.  Correct.  Never worked for Carmel Clay Schools.
16 Q.  All right.  All right.  What did you do to
17     prepare for this deposition today besides talk
18     to your lawyers?  You don't have to tell me
19     about conversations you had with your lawyers.
20 A.  Other than that, nothing.
21 Q.  Did you review any documents?
22 A.  Yes.
23 Q.  Which documents did you review?  So you can
24     tell me which documents you reviewed, but don't
25     tell me what you -- if you talked with them

9

1      about your lawyer (verbatim), just say I read
2      the whatever, but I don't need to know the
3      conversation you had with your lawyer about it,
4      just the names of the documents.
5  A.  I reviewed the two that were provided, the
6      production of documents and the management
7      agreement for Carmel Swim Club, Carmel Clay
8      Schools.
9  Q.  So you -- the production of documents is like a
10     couple thousand pages.  Is that what you
11     reviewed?
12 A.  No, I read the production of documents, our
13     objection to the materials.
14         MS. SCHNELKER:  He's referring, Jon, to
15     the documents that we sent yesterday, the
16     responses to the request for production.
17         MR. LITTLE:  Oh, okay.  Not the request
18     for production for the whole case, okay.
19         MS. SCHNELKER:  Correct.
20 BY MR. LITTLE:
21 Q.  So just the management agreement and then like
22     a two-pager of legal why we're not going to
23     give you this or what I'm asking for kind of
24     thing, right?
25 A.  Yes, sir.

3 (Pages 6 to 9)

Jim Inskeep
February 23, 2021

**10**

1  Q.  Nothing else besides that?
2  A.  I reviewed some e-mails as well during that
3      time period that -- that potentially could have
4      been brought up today.
5  Q.  And were those e-mails on your computer or did
6      someone provide them to you?
7  A.  Those were provided to me.
8  Q.  By counsel?
9  A.  Yes, sir.
10 Q.  Okay.  And besides those e-mails, anything
11     else?
12 A.  Not to my knowledge, no.
13 Q.  Okay.  Did you speak to anybody besides your
14     attorneys about this deposition?
15 A.  No, sir.
16 Q.  Have you ever been deposed before?
17 A.  Yes.
18 Q.  Okay.  And what -- when have you been deposed
19     before?
20 A.  The year was around 2002.
21 Q.  And what were you deposed about?
22 A.  It was a lawsuit from an individual that we --
23     with our cross country program that we said can
24     no longer have contact with our cross country
25     program.

**11**

1  Q.  Was that Josh Trisler?
2  A.  No, sir.
3  Q.  Who was that?
4  A.  Schmidt was the last name, Dr. Schmidt.
5  Q.  Was he a dentist in Carmel -- in Indianapolis?
6  A.  I believe so.
7  Q.  He ended up dying of -- he fell asleep in a
8      sauna?
9  A.  I don't know.  Did he?
10 Q.  Yeah, I think so.  I think that's the same guy.
11     What was that lawsuit about?
12 A.  That individual was in violation of Indiana
13     High School Athletic Association by-laws, was
14     providing money to student athletes for --
15     basically as reward for performance, which is a
16     by-law violation.
17 Q.  Okay.  And who sued you?
18 A.  That individual, Dr. Schmidt.
19 Q.  Okay.  And did you end up -- do you know how
20     that case resolved?
21 A.  I do not know.
22 Q.  Okay.  Speak -- let's stick with cross country.
23     Do you remember an individual named Josh
24     Trisler?
25 A.  Yes.

**12**

1  Q.  Okay.  Did he end up suing the Carmel School
2      Corporation?
3  A.  I believe so.  I was not a called witness.  But
4      I do recall that there was a lawsuit, either
5      against Carmel Clay Schools or the head coach
6      at that time.
7  Q.  And that coach was Chuck Koeppen?
8  A.  Yes.
9  Q.  Okay.  So do you know if the Carmel -- what was
10     Mr. Trisler alleged to have done?
11 A.  I'm not sure what the actual lawsuit was.  I
12     did not see it.
13 Q.  Do you know if the Carmel schools paid
14     Mr. Trisler?
15 A.  I do not know the answer to that.
16 Q.  Was Mr. Trisler alleged to have engaged in
17     sexual conduct with a Carmel athlete?
18 A.  No.
19 Q.  He was not alleged to have engaged in sexual
20     conduct with ███████████?
21 A.  No, not to my knowledge.
22 Q.  Mr. -- okay.  Was Mr. Trisler -- did he feel he
23     was wrongly accused of engaging in sexual
24     conduct with an athlete?
25         MS. SCHNELKER:  Objection.  Lack of

**13**

1      personal knowledge of this witness.  There's no
2      way for him to know that.
3      BY MR. LITTLE:
4  Q.  You can answer.
5          MS. SCHNELKER:  You can answer.
6  Q.  You can still answer.
7  A.  Okay.
8          MS. SCHNELKER:  Unless I tell you not to,
9      you can answer.
10 A.  Sure.  I'm not aware of any sexual contact
11     between those two individuals.  I do know that
12     I questioned Mr. Trisler during that time
13     period as an assistant coach of our cross
14     country program because it had come to my
15     attention that he had purchased a sports bra
16     for ████████, who was a student athlete
17     in the program at that time.  I did not feel
18     that was appropriate at all.  I questioned him
19     about that.
20         I also spoke with the father of ███ at
21     that time.  ████ father did not have any
22     issue with that, which was very surprising to
23     me.
24         So we did release Mr. Trisler from his
25     coaching position sometime thereafter.

4 (Pages 10 to 13)

Jim Inskeep
February 23, 2021

14

1　Q.　Okay.　And then he subsequently sued the Carmel
2　　　School Corporation, correct?
3　A.　I believe that is the sequence there, yes.
4　Q.　Okay.　And you don't -- you don't know how that
5　　　suit resolved?
6　A.　No, I do not.
7　Q.　Okay.　Where would I go to get a copy of the
8　　　resolution of that suit?　Who would I ask for
9　　　that?
10　A.　I would assume that would be available at our
11　　　central office, but we -- I do not have
12　　　anything to that information there, no.
13　Q.　Who would you go to at your central office to
14　　　get a copy of that?
15　A.　I would start with the superintendent's office.
16　Q.　Okay.
17　A.　But I'm not sure how far back those are kept
18　　　over the years.
19　　　　　MS. SCHNELKER:　Jon, I can tell you it's
20　　　my understanding from our client that no
21　　　information concerning the lawsuits are kept
22　　　past 2007.　That's the farthest back it goes.
23　　　　　MR. LITTLE:　Well, we know we'll be
24　　　visiting this with the Magistrate again soon,
25　　　so...

15

1　　　　　MS. SCHNELKER:　Okay.
2　　　BY MR. LITTLE:
3　Q.　Let's see.　Did you have any conversations with
4　　　Chris Plumb before today's deposition?
5　A.　No, not about this case.
6　Q.　Do you know Mr. Plumb has been deposed,
7　　　correct, in this case?
8　A.　That is my understanding, yes.
9　Q.　Did you talk to him after his deposition?
10　A.　No, I did not.
11　Q.　Did you talk to Jon Ranochak about his
12　　　deposition?
13　A.　No, I did not.
14　Q.　Did you talk to him about your deposition?
15　A.　No, I did not.
16　Q.　Have you talked to -- do you know a gentleman
17　　　named Bernard Pylitt, Bernard "Buddy" Pylitt?
18　A.　I am familiar with him, yes.
19　Q.　Have you talked to Mr. Pylitt about this case?
20　A.　No, I have not.
21　Q.　When was last time you talked to Mr. Pylitt?
22　A.　I received a text from him two weeks ago
23　　　congratulating on the girls swimming state
24　　　finals.
25　Q.　Okay.　Have you ever talked to Mr. Pylitt about

16

1　　　any allegations of molestation involving Carmel
2　　　swimmers?
3　A.　Not to my knowledge.　He has provided various
4　　　legal advice and probably services through the
5　　　Carmel Swim Club over the years in my time
6　　　knowing him.　But, no, nothing directly with
7　　　him.
8　Q.　Mr. Pylitt is not the lawyer for the Carmel
9　　　School Corporation, correct?
10　A.　Correct.
11　Q.　And as far as you know, has he ever been a
12　　　lawyer for the Carmel School Corporation?
13　A.　Not to my knowledge, no.
14　Q.　Do you know a gentleman named David Day?
15　A.　Yes, sir.
16　Q.　Okay.　Has Mr. Day been a lawyer for the Carmel
17　　　School Corporation?
18　A.　Yes, he has served in, I assume, one of many
19　　　roles with the school district as an attorney
20　　　since my first year as an administrator.
21　Q.　Okay.　Besides Mr. Day, what other lawyers are
22　　　you aware of for the Carmel School Corporation?
23　A.　The one representing me today; Libby Roberts
24　　　also from Church, Church, Hittle and Antrim.
25　　　Most all of my -- my dealings have been through

17

1　　　that firm.　I believe Alex Pinegar as well.　So
2　　　virtually all of those have gone through the
3　　　same -- same law firm there.
4　Q.　Besides Church, Church, Hittle, any other law
5　　　firms that you're aware of?
6　A.　Not -- not to my recollection.
7　Q.　Okay.　Who is your supervisor at Carmel?
8　A.　My direct supervisor is Dr. Tom Harmas,
9　　　principal.
10　Q.　Okay.　I mean -- and that's the person who
11　　　could fire you, conceivably?
12　A.　I think there's a long line of those folks,
13　　　so --
14　Q.　Okay.
15　A.　-- it could be the principal, the
16　　　superintendent, human resources, school board.
17　Q.　Okay.　But if you -- if someone -- if you were
18　　　to report to your supervisor, you believe that
19　　　to be the high school principal, correct?
20　A.　Yes.
21　Q.　Okay.　If you had -- if you had a suspicion of
22　　　sexual abuse, who would -- what would you do
23　　　with that information -- or those duties?
24　A.　I would speak with the authorities or with
25　　　Child Protective Services.

5 (Pages 14 to 17)

Jim Inskeep
February 23, 2021

18

1   Q.  Directly, you would pick up the phone and call
2       them directly?
3   A.  Yes.
4   Q.  Okay.  Have you ever had to do that in the
5       past?
6   A.  I have not.
7   Q.  Okay.  Do you know who you would call?  Is
8       there a contact number that you have?
9   A.  I have a contact number for Child Protective
10      Services, which we provide to our -- our
11      coaches.  I also would probably call one of our
12      school resource officers directly.
13  Q.  Okay.  And is that what you would have done in
14      2017 as well?
15  A.  Yes.
16  Q.  Specifically in December 2017?
17  A.  Yes.
18  Q.  Okay.  And that's what you would have expected
19      your coaches to do, or would you expect your
20      coaches to come to you first?
21  A.  No, I would expect coaches to go directly to
22      that.  I think if there was a question, they
23      might come to their supervisor requesting
24      advice or counsel on that, and what direction
25      to go.  But, yes, that would be the direction

19

1       and information that's provided to coaches.
2   Q.  And you provided that information to coaches in
3       2017 as well?
4   A.  Yes.
5   Q.  Okay.  And if a coach had a suspicion of sexual
6       abuse, you would expect them to call -- in
7       2017, December 2017 specifically, you would --
8       you would expect them to go to CPS and to talk
9       to you as well?
10  A.  Yes.
11  Q.  Okay.  And where do you develop that
12      expectation from?
13  A.  We have preseason coaches meetings where we
14      distribute that information and other stuff
15      pertinent to the year.
16  Q.  Okay.  And I saw that on some of your
17      materials.  How do I get a copy of the
18      presentation from 2017?
19  A.  I believe that is with our attorneys.
20          MS. SCHNELKER:  You mean a copy of the
21      meeting notes?
22          MR. LITTLE:  No, there's like on -- oh,
23      let's see.
24          MS. SCHNELKER:  The agenda has been --
25      the complete agenda has been provided.

20

1          MR. LITTLE:  Right.  And the agendas show
2       both a meeting with the coaches and a Safe
3       Sport training that the kids watch before they
4       take the bus to their meet.  Like 39 -- number
5       3906, for example.  3034.
6   BY MR. LITTLE:
7   Q.  Do you have a copy of those actual trainings?
8   A.  That's -- those are switching two different
9       materials there.
10  Q.  Okay.
11  A.  One is the high school preseason coaches
12      meeting agenda notes that you have.  The Safe
13      Sport is specific to the Carmel Swim Club.
14  Q.  Okay.  So how do I get a copy of both of those?
15  A.  I believe we've provided a copy of the
16      preseason coaches meeting.  I do not have a
17      copy of the Safe Sport.  That's not something
18      I'm directly involved with.
19  Q.  So let's talk about the preseason coaches
20      meeting.  Is it like a PowerPoint or -- on the
21      issue of Safe Sport, is it a PowerPoint?  Is it
22      a -- paper handouts?  What is it?
23  A.  Safe Sport is not a term that we use.  We do
24      not use that program.
25  Q.  Okay.  What do you use at the preseason coaches

21

1       meeting?
2   A.  We discuss all their legal responsibilities or
3       as many of them as we can, specifically is --
4       things that we speak about is texting of
5       student athletes.  And also that duty and
6       obligation to report suspicion of child abuse
7       as well.
8   Q.  Let's talk about texting of student athletes.
9       What do you guys -- what does the Carmel school
10      tell its coaches about texting of student
11      athletes?
12  A.  At that time, our policy in the athletic
13      department was that coaches are not to contact
14      student athletes one-on-one for conversational
15      information.  Our theme there is informational,
16      not conversational.
17  Q.  And so that was the presentation that you made
18      to the coaches?
19  A.  Yes, sir.  And then --
20  Q.  You, personally?
21  A.  Yes.  And then currently, our -- following the
22      arrest of Mr. Goelz, we subsequently revised
23      that and now we have three-way communication
24      between coaches and student athletes so that
25      there's no one-on-one contact via any of those

6 (Pages 18 to 21)

Jim Inskeep
February 23, 2021

22

1    communication uses that they have between apps
2    and everything else and direct texting.
3        So they either have to copy in another
4    coach, or it could be a coach to the whole
5    group of athletes, or it could be a coach with
6    the parent and the student athlete.
7    Q.   And where did you develop that policy from?
8    A.   That came out of our discussions on how to keep
9    kids safe.
10   Q.   And how do you monitor that policy?
11   A.   We've told our student athletes that, you know,
12   all those communications should be three-way.
13   So if you are receiving one-on-one texts that
14   are not informational, if you're receiving a
15   one-on-one communication from your coach,
16   you're under no obligation to respond to that.
17   And also you should report that to someone in
18   administration or your parents to look at that
19   further.
20       Now, I understand there's obviously
21   the -- I'm sending out an informational --
22   information that's pretty significant there,
23   just a, you know, I'm going to miss practice
24   today.  But when we start talking about other
25   types of communications that are inappropriate

23

1    or well beyond the scope of informational, then
2    obviously that is a violation of our -- our
3    policy.
4    Q.   You would agree with me that coaches -- let's
5    go -- let's do first December 2017.  Coaches at
6    Carmel High School should not be texting
7    athletes about boyfriends, correct, about the
8    athletes' boyfriends?
9    A.   That is correct.
10   Q.   They shouldn't be texting them about trouble
11   with their home life, correct?
12   A.   That is correct.
13   Q.   Okay.  And if an athlete in 2017 was receiving
14   texts like that from those coaches and another
15   coach on the staff knew about it, you would
16   have liked to have been aware of that, correct?
17   A.   Yes.
18   Q.   And the coach who was aware of the
19   inappropriate text by one of his fellow
20   coaches, that coach should have told you when
21   he became aware of that, correct?
22   A.   Yes, that would be my expectation.
23   Q.   And that would have been your expectation in
24   December 2017 as well, correct?
25   A.   Yes.

24

1    Q.   And it's your expectation today, correct?
2    A.   Yes.
3    Q.   Okay.  Turning back to this case, have you
4    spoken to any media about this case?
5    A.   No, I have not.
6    Q.   Any family or friends about -- and I'm asking
7    you, I realized, to go back to -- let me ask --
8    let's start here.  When did you first learn
9    that Mr. Goelz may have had an inappropriate
10   relation- -- may have had illegal sexual
11   contact with Ms. Nieves?
12   A.   At the time of his arrest.
13   Q.   Okay.  And what did you do when you found out
14   about Mr. Goelz's arrest?
15   A.   I can't remember if I was told directly from
16   someone in the school district or from a
17   contact with the police at the time of their
18   arrest, I don't remember exactly the specifics
19   of that.  But right at that time period, then I
20   did speak with the principal and our new
21   superintendent at that time, Dr. Michael
22   Beresford.
23   Q.   Okay.  And what did the superintendent have to
24   say?
25   A.   Well, same response as mine, which was, you

25

1    know, disgust and anger and, obviously, we were
2    concerned for the student in that situation as
3    well.
4    Q.   Okay.  Did you ever reach out to Gabriela or
5    her family?
6    A.   No, I did not.
7    Q.   Why not?
8    A.   That was being handled through our counseling
9    center.  And I was not even provided the name
10   of the student athlete involved until much
11   later on.
12   Q.   When did you get the name of the student
13   athlete involved?
14   A.   I believe it was sometime in the fall, if I'm
15   not mistaken, when it was determined that she
16   was going to go back out for the swim team.
17   Q.   How did you get her name?
18   A.   I do not recall that.
19   Q.   Okay.  Did you reach out to her then, when you
20   found out she was going to go back out for the
21   swim team?
22   A.   No, I did not.
23   Q.   Why not?
24   A.   That was being handled through her counselor
25   and other support systems that had been

7 (Pages 22 to 25)

Jim Inskeep
February 23, 2021

26

1  established.
2  Q.  And who -- who is -- who else was in that
3      support system besides her counselor?
4  A.  I do not recall at that time who else was
5      involved in that, but I'm fairly certain
6      counselor and social worker would be the normal
7      protocol there, trying to keep it as normal as
8      possible for her after this situation.
9  Q.  Who was the -- do you know who her counselor
10     was?
11 A.  I do not recall that.
12 Q.  Do you know who the social worker would have
13     been?
14 A.  I do not know.  We've -- we've run through
15     quite a few.
16 Q.  Okay.  How did you first meet Mr. Goelz?
17 A.  He was brought to me by Coach Plumb as a
18     potential assistant coach for the program.
19 Q.  Okay.  And you have to approve all of the
20     potential coaches, correct?
21 A.  Yes, sir.
22 Q.  Okay.  So you met him, do you remember when?
23 A.  I believe -- I don't think that was his first
24     year, that may have been his second year, but
25     it would have been in the fall of the first

27

1  year he joined our staff.
2  Q.  The first year he joined the Carmel High School
3      staff?
4  A.  Correct.
5  Q.  And in December 2017, John Goelz was definitely
6      on the Carmel High School staff, correct?
7  A.  Yes, sir.
8  Q.  Okay.  And so you met him, you approved of him
9      being a coach.  You could have fired him,
10     correct, or -- at any time, if you had reason,
11     correct?
12 A.  Yes, that is correct.
13 Q.  Okay.  And you -- you required that he take the
14     training that we discussed earlier, correct?
15 A.  Yes, he was a part of that preseason meeting of
16     that information and then completed all the
17     other requirements that we would have for any
18     of our coaches.  Our volunteer coaches are held
19     to the same standards and requirements that we
20     have for our paid staff as well.
21 Q.  Okay.  But -- and at the end of the day -- so,
22     I mean, he had to take a concussion training,
23     he had to fill out whatever forms you deemed he
24     had to fill out, correct?
25 A.  Yes.

28

1  Q.  You'd do a background check, correct?
2  A.  Yes.  He completed the background check that
3      was required by Carmel Clay Schools.
4  Q.  Okay.  And the first time you learned about any
5      allegations of possibly illegal or
6      inappropriate behavior by Mr. Goelz was when he
7      was arrested?
8  A.  Yes.
9  Q.  When was the first time -- well, let me ask you
10     this.  Did you ever discuss Mr. Goelz's arrest
11     with Chris Plumb?
12 A.  At that time of the arrest, I did discuss that
13     with him.
14 Q.  Okay.  Tell me about that conversation.
15 A.  My recollection was, you know, what happened?
16     What do we know?  Then also I serve on the
17     Carmel Swim Club as the Carmel Clay Schools
18     representative for that.  And it's more of an
19     informational and resource to the Carmel Swim
20     Club.  So we discussed that and how would we be
21     responding to the -- not only the community,
22     but obviously the Swim Club families, most of
23     which are Carmel High School families to, you
24     know, have a response to what had occurred and
25     the arrest.

29

1  Q.  Okay.  And was this a phone call or an
2      in-person conversation?
3  A.  I think we did both.  I think we spoke on the
4      phone.  I think we met in person as well.
5  Q.  Okay.  So tell me more about it.  What was
6      the -- what was the discussion of the response
7      of the Swim Club?
8  A.  I don't recall the specifics of that meeting,
9      but -- but I think the overview of the
10     conversation was, you know, how are we going to
11     respond to this, to the parents and the
12     families involved.  And then, you know,
13     obviously, further down the line, what other
14     kind of steps that we're going to take to
15     prevent this from occurring in the future.
16 Q.  Okay.  Did you go to any of the criminal
17     proceedings in this case?
18 A.  No, I did not.
19 Q.  Did you receive any updates on the criminal
20     proceedings in this case?
21 A.  Only what was out there in the media.
22 Q.  Did you speak to any law enforcement officers
23     about this case?
24 A.  No, not -- after the initial conversation of
25     his arrest, no.

8 (Pages 26 to 29)

Jim Inskeep
February 23, 2021

---

30

1  Q.  Okay.  Did you do an internal investigation
2      into this matter?
3  A.  No, we did not.
4  Q.  Did you discipline anybody in connection
5      with -- you know, obviously besides firing
6      Mr. Goelz -- discipline anybody in the Carmel
7      athletic department as result of this matter?
8  A.  No.
9          MR. LITTLE:  Gaby, can you put up 4607?
10     We'll have that as Exhibit 1.
11         (WHEREUPON, Deposition Exhibit 1 was
12     marked for identification.)
13         MR. LITTLE:  Okay.
14         MS. OLSHEMSKI:  All right.  Can you see
15     that?
16         MR. LITTLE:  Yeah.  Not anymore.  Now I
17     can.
18  BY MR. LITTLE:
19  Q.  All right.  Sir, can you see that exhibit?
20  A.  Yes, I can.
21  Q.  Can you take a second and just review that.
22  A.  (Witness complied with request.)
23  Q.  Is that your e-mail, jiminskeep@ -- is jln --
24     or jinskeep@ccs k12.in.us?
25  A.  Yes, it is.

---

31

1  Q.  Okay.  Who is Kip?
2  A.  Kip is Kip Zurcher who was the Carmel Swim Club
3      on the board at that time.
4  Q.  Is he an employee of the Carmel School
5      Corporation?
6  A.  No, he is not.
7  Q.  Okay.  Why was he consulted about a statement
8      in this case?
9  A.  I don't remember if Kip was the president at
10     that time of the Carmel Swim Club, of the
11     board, but Kip was very involved with that.
12     And I'm not sure if his day job is as an
13     attorney or not.  I'm not -- not familiar with
14     his line of work, but...
15  Q.  I'm going to say why does the Carmel School
16     Corporation care what the Carmel Swim Club says
17     about anything at the end of the day?
18  A.  No, I think that's a very good question.  And
19     the relationship between the Carmel Swim Club
20     and Carmel Clay Schools is very similar to the
21     relationship between the Carmel Dads' Club and
22     Carmel Clay Schools.  Both entities exist
23     basically as a community outreach to serve
24     youth in our community.  So there's a lot of,
25     not only sharing of facilities, but, you know,

---

32

1      sharing of philosophy and providing
2      opportunities for kids.
3          So that relationship between the Swim
4      Club and Carmel Clay Schools, while separate,
5      obviously, there are some things that we -- we
6      have together.
7          And the Carmel Swim Club uses the
8      natatorium, which is located on Carmel Clay
9      School's property and is part of Carmel High
10     School.  And we had the same relationship with
11     Carmel Dads' Club as well where they utilize
12     facilities, and at the end of the day, serving
13     primarily students that live in Clay Township.
14  Q.  Okay.  If I wanted to --
15         MR. LITTLE:  Gaby, you can take that
16     down.  Thank you.  Just remember, mark it as
17     Exhibit 1 so we can keep it straight at the
18     end.
19  BY MR. LITTLE:
20  Q.  Was Buddy Pylitt consulted about making --
21     about this statement in this case?
22  A.  I do not recall at that time.
23  Q.  Do you have any communications with Buddy
24     Pylitt, like e-mails, from this time period or
25     anything?

---

33

1  A.  I do not know whether I do or not.
2  Q.  Do you have the same e-mail address now as you
3      had then?
4  A.  Yes, I do.
5  Q.  Okay.  So if we send a request to your counsel
6      that -- e-mails from Buddy Pylitt, that's
7      something you could search for?
8  A.  Yes, I would assume that would be something
9      that could be searched for.
10  Q.  Okay.  And now -- just a couple of quick
11     questions here.  December 2017, Chris Plumb was
12     definitely an employee of the Carmel Clay
13     School Corporation?
14  A.  Yes.
15  Q.  Jon Ranochak was definitely an employee of the
16     Carmel Clay School Corporation?
17  A.  Yes.
18  Q.  And they still are today, correct?
19  A.  Yes, both.
20  Q.  Okay.  All right.  If I wanted to rent the
21     pool -- let's talk about the relationship
22     between the Carmel Swim Club and Carmel Clay
23     Schools.  If I wanted to rent the pool for a
24     pool party or something, right, I don't know,
25     my kid's birthday, whatever, how much would it

---

Fillenwarth Reporting Service
317.345.6179

Jim Inskeep
February 23, 2021

34

1    cost me a day to rent the pool or an hour or
2    however you do it?
3  A.  I am not --
4        MS. SCHNELKER:  Objection, relevance.  Go
5    ahead.
6  A.  Yes, I'm not familiar with the fee structure
7    because that's not something that's handled out
8    of our office.  But that would go through the
9    Carmel Swim Club.
10       BY MR. LITTLE:
11  Q.  I'd have to talk with the Carmel Swim Club to
12    rent the Carmel High School pool?
13  A.  Yes, sir.
14  Q.  Okay.  Have you discussed -- well, let's go
15    back.  So the Carmel School Corporation gives
16    the Carmel Clay Swim -- or gives the Carmel
17    Swim Club free office space, correct?
18  A.  There is an office provided in the natatorium,
19    yes, for the aquatics director.
20  Q.  Okay.  And is there any other office space
21    provided by the Carmel Clay School Corporation
22    to the Carmel Swim Club at all?
23  A.  There is an oversized closet in which coaches
24    keep their stuff.  But it's far from a coaches'
25    office.  The aquatics director office is really

35

1    the only thing that I would consider to be an
2    office in that area.
3  Q.  But is there another off-site office space for
4    the Carmel Swim Club across the street or
5    something?
6  A.  Yes, it's my understanding the Carmel Swim Club
7    rents space or space is provided, I'm not sure
8    how that agreement is, in property that is
9    owned by Carmel Clay Schools across the street
10    from Carmel High School.
11  Q.  So you don't know if the Carmel Swim Club pays
12    rent for that space or not?
13  A.  I'm not familiar with that agreement.  That
14    would go through our business office.
15  Q.  Okay.  And do you know if the Carmel Clay
16    School Corporation paid to remodel that space
17    or if the Swim Club paid for it?
18  A.  I do not know the answer to that.
19  Q.  Okay.  Have you discussed this case at any
20    Carmel Swim Club board meetings?
21  A.  Not to my recollection.
22       MS. SCHNELKER:  Hold on one second.  Can
23    you clarify what you mean by "this case"?  This
24    present case?
25       MR. LITTLE:  Sure.  The Nieves case.

36

1    Yes, the Gabriela Nieves case.
2        MS. SCHNELKER:  Go ahead, Jim.
3  A.  Not to my recollection.  But it's been three
4    years ago, so I -- if it was, it's not ringing
5    a bell right now.
6    BY MR. LITTLE:
7  Q.  Do you remember discussing this case at all
8    with anybody on the Carmel Swim Club board?
9  A.  I'm sure there were conversations, but I don't
10    recall anything specific at this time.
11  Q.  You can't recall even who you talked to or
12    anything in these conversations?
13  A.  No.
14  Q.  Do you know if anyone from the Carmel Swim Club
15    board has reached out to my client about this
16    case?
17  A.  I do not know.
18  Q.  About her -- how about her parents?
19  A.  I did not know.
20  Q.  Have you, as a Carmel athletic director,
21    reached out to her parents at all?
22  A.  No, I have not.
23  Q.  Do you know if the Carmel Swim Club did an
24    internal investigation into this case -- into
25    the allegations in this case?

37

1  A.  I do not know.
2  Q.  Have you spoken to anyone from the Center
3    for -- the U.S Center -- are you -- strike
4    that.
5        Do you know what the U.S. Center for
6    SafeSport is?
7  A.  I am familiar with the term, yeah.
8  Q.  Have you spoken to anybody from the U.S. Center
9    for SafeSport about this case?
10  A.  I have not.
11  Q.  Have you spoken to the U.S. Center for
12    SafeSport about any allegations regarding
13    Christopher Plumb and any failures in this
14    case?
15  A.  No, I have not.
16  Q.  Do you know if the Center for SafeSport is
17    investigating Mr. Plumb's failures to report in
18    this case?
19  A.  Not to my knowledge.
20  Q.  Okay.  Have you spoken to Buddy Pylitt about
21    this case?
22  A.  If I did, it was way back in that three-year
23    time period, three years ago, but I don't
24    recall what that conversation was.
25  Q.  How about Kris Kazmierczak?

10  (Pages 34 to 37)

Jim Inskeep
February 23, 2021

---

38

1    A.  I'm not familiar with that name.
2    Q.  Okay.  Have you talked to anyone from USA
3        Swimming about this case?
4    A.  No, I have not.
5            MR. LITTLE:  Can we put up, Gaby, 1807?
6        We'll mark it as Exhibit 2.
7            (WHEREUPON, Deposition Exhibit 2 was
8        marked for identification.)
9            MS. OLSHEMSKI:  That one?
10           MR. LITTLE:  1807.
11           MS. OLSHEMSKI:  Yeah.  It closed out.
12           MR. LITTLE:  We can come back to it if
13       you don't have it up right now.
14           MS. OLSHEMSKI:  Here we go.  Sorry.
15       BY MR. LITTLE:
16   Q.  Okay.  Sir, if you could take a look at what's
17       on the screen.  Who is Roger McMichael?
18   A.  Mr. McMichael is the associate superintendent
19       for business affairs for the school district.
20           MR. LITTLE:  Okay.  Can you scroll down,
21       Gaby?
22       BY MR. LITTLE:
23   Q.  Okay.  Do you know who Lisa, that Chris Plumb
24       is talking about, is?
25   A.  I would assume Lisa is Lisa Sheets, the office

---

39

1        manager for Carmel Swim Club.
2    Q.  Okay.  And do you see the second sentence, "On
3        another note" there?
4    A.  Yes.
5    Q.  "Does your offer still stand of free rent in
6        the space?"  Do you know if Carmel is -- the
7        Carmel Clay School Corporation did indeed give
8        the space to the Carmel Swim Club rent free?
9    A.  That's not part of my area.  I'm not familiar
10       with it.
11   Q.  Okay.  All right.
12           MR. LITTLE:  We take that down, Gaby.
13       Thanks.
14           MS. OLSHEMSKI:  Jon, we can see your
15       outline.
16           MR. LITTLE:  Oh, sorry.
17       BY MR. LITTLE:
18   Q.  Okay.  When you -- if you were to receive --
19       you, yourself, as athletic director, were to
20       receive an allegation of sexual abuse, someone
21       says:  Hey, Mr. Inskeep, I think so and so...
22       and it has to do with sexual abuse, and you
23       call CPS, who in your chain of command do you
24       report that to?  Who do you say, hey, I got
25       this allegation of sexual abuse?

---

40

1    A.  I would start with my immediate supervisor, the
2        principal.  And we would have discussion on who
3        else we would start speaking with at that time
4        as well.
5    Q.  Okay.  And that's what you would have done in
6        December 2017?
7    A.  Yes.
8    Q.  And then that's what you would do now, too?
9    A.  Yes.
10   Q.  Okay.
11           MR. LITTLE:  Gaby, can you put up 3906?
12           (WHEREUPON, Deposition Exhibit 3 was
13       marked for identification.)
14       BY MR. LITTLE:
15   Q.  And this is mainly, sir, just to get this into
16       evidence.  We already discussed this.  I -- can
17       you correct me, if I'm wrong, but right here --
18           MR. LITTLE:  Slow down, Gaby.  Go back to
19       the time schedule -- or actually, go to the top
20       so he can see what it is.
21       BY MR. LITTLE:
22   Q.  Okay.  This e-mail from 2018 talking about the
23       first swim meet of the season, if you look down
24       at the entry for 3:20 to 3:50 p.m., do you see
25       that?

---

41

1    A.  Uh-huh.
2    Q.  It says there's a SafeSport meeting.  What is
3        that?
4            MS. SCHNELKER:  Hey, Jon, I'm just going
5        to object to the extent that I don't see his
6        e-mail address on this.  So I'm not sure that
7        this witness is the right person to properly
8        authenticate it.  But you can go ahead and ask
9        him if he knows that.
10       BY MR. LITTLE:
11   Q.  Sure.  Sir, are you familiar with a SafeSport
12       meeting for the Carmel High School swim team?
13   A.  No.  And it looks like on that e-mail, it says
14       club swimmers ahead of it.
15   Q.  Okay.  What does that mean to you, club
16       swimmers, if you have any opinion?
17           MS. SCHNELKER:  Objection.  Just lack of
18       personal knowledge.  Go ahead.
19   A.  My opinion would be that would be swimmers that
20       swim for Carmel High School and for the Club.
21       But we do have a percentage of student athletes
22       that do not swim with the club; they do high
23       school only.
24   Q.  Okay.  You -- have you ever seen this SafeSport
25       training for the Carmel Swim Club?

---

11 (Pages 38 to 41)

Jim Inskeep
February 23, 2021

42

1    A.  No, I have not.
2    Q.  Okay.  If you wanted to get a copy of it, who
3        would you go to for that?
4    A.  I would contact Coach Plumb.
5    Q.  Do you know if it's a video or written
6        materials or anything about it?
7    A.  I do not know.
8    Q.  Okay.  All right.  So turning to December 2017.
9        In December 2017, did Mr. Plumb relay any
10       concerns about Gabriela Nieves possibly being
11       involved in inappropriate text communications
12       with Chris -- with John Goelz?
13   A.  No, not to me.
14   Q.  Okay.  Have you learned -- well, strike that.
15           MR. LITTLE:  The let's put up -- Gaby,
16       can you put up the e-mail from Mr. Hahn -- or
17       from Mr. Ranochak to Mr. Plumb, rather.
18           (WHEREUPON, Deposition Exhibit 4 was
19       marked for identification.)
20       BY MR. LITTLE:
21   Q.  Okay.  Let's mark this as Exhibit 4.  Sir, can
22       you take a second and read what's on the screen
23       there?
24   A.  Yes, I'm finished.
25   Q.  Okay.  Have you ever seen that e-mail before?

43

1    A.  The only time I've seen that e-mail is in
2        preparation for this deposition today.
3    Q.  So prior to 2021, you had never seen this
4        e-mail?
5    A.  Correct.
6    Q.  Okay.  And correct me if I'm wrong, but in
7        December 2017, you would have expected a coach
8        to come to you if one of his subordinates
9        was -- or strike that.
10           I believe you testified earlier that in
11       December 2017, you would have expected a coach
12       to come to you if one of his assistant coaches
13       was texting an athlete about boyfriends and
14       parent trouble, correct?
15   A.  Yeah, I think it's easy to say at this point,
16       knowing what we know, that we would investigate
17       those text messages.  But, you know, I would
18       say given this information, the boyfriends and
19       not swim-related, yes.
20   Q.  You would have expected to have been notified
21       about this, correct?
22   A.  Yes.
23   Q.  Okay.  What was your re- -- what's your
24       reaction to this e-mail, seeing it four years
25       lat- -- almost three-plus years later?

44

1    A.  I don't know that I have much of a reaction to
2        it other than given that information, it would
3        have been really good to have that conversation
4        with myself.
5    Q.  Did you -- in December 2017, if you'd received
6        this information, you would have investigated
7        it, correct?
8    A.  Yes.
9    Q.  Would you have talked to Gabriela?
10   A.  Yes.
11   Q.  Would you have notified her parents?
12   A.  Yes, sir.
13   Q.  Would you have talked to Mr. Goelz?
14   A.  Yes, sir.
15   Q.  Are you aware -- so you see the date of the
16       e-mail is December 12, 2017.  Do you know that
17       Christopher Plumb never spoke to Gabriela
18       Nieves about the concerns related here?
19           MS. SCHNELKER:  Objection to the lack of
20       personal knowledge and foundation.  You can
21       answer.
22   A.  Can you ask the question again?  I'm sorry.
23       BY MR. LITTLE:
24   Q.  Sure.  The date of this e-mail, do you see
25       December -- can you tell me what the date of

45

1        this e-mail is?
2    A.  December 12, 2017.
3    Q.  Okay.  Do you know that in response to these
4        concerns, Mr. Plumb never spoke to Gabriela
5        Nieves?  Did you know that?
6           MS. SCHNELKER:  Same objection.
7    A.  No.
8       BY MR. LITTLE:
9    Q.  Did you know that in response to these
10       concerns, Mr. Plumb never spoke to Ms. Nieves'
11       parents?  Did you know that?
12   A.  No.
13   Q.  In response to these concerns, Mr. Ranochak
14       never spoke to Gabriela Nieves, did you know
15       that?
16   A.  No.
17   Q.  And Mr. Ranochak never spoke to her parents in
18       response to these concerns, did -- were you
19       aware of that?
20   A.  No, sir.
21   Q.  But the first time you became aware of any
22       potential inappropriate or illegal activity
23       with Mr. Goelz was in July of 2017 when he was
24       arrested, is that right?
25   A.  Yes, I believe that's the date.

12  (Pages 42 to 45)

**46**

1　Q.　All right.  Prior to his arrest, had you ever
2　　　had any --
3　　　　　　·MS. SCHNELKER:  I'm sorry, I'm just going
4　　　to correct for the record, it was in July of
5　　　2018.
6　　　　　　MR. LITTLE:  Oh, July 2018.  Okay, sorry.
7　　　I thought that's what I said, but --
8　　　　　　MS. SCHNELKER:  That's okay.
9　　　BY MR. LITTLE:
10　Q.　All right.  Prior to his arrest, had you had
11　　　any complaints about Mr. Goelz?
12　A.　Not to my recollection, no.
13　Q.　Do you know who Ronald Hahn is?
14　A.　Yes, I do.
15　Q.　Okay.  Let me ask you this:  In response to
16　　　these -- Mr. Hahn's conversation, if this had
17　　　been brought to you in December 2017, would you
18　　　have called Mr. Hahn?
19　A.　If I knew that Mr. Hahn was -- I'm sorry, can
20　　　you say that again?
21　Q.　Sure.  If Mr. Hahn had come to one of -- well,
22　　　Mr. Hahn did come to one of your assistant
23　　　coaches, relay the concerns detailed here in
24　　　Exhibit 4.  If Mr. Plumb had come to you in
25　　　December of 2017 saying, hey, this is what

**47**

1　　　Ronald Hahn apparently told Jon Ranochak, would
2　　　you have called Mr. Hahn?
3　A.　No.
4　Q.　Why not?
5　A.　I would have contacted Gabriela's parents.
6　Q.　Okay.
7　A.　I don't -- I don't deal much with hearsay and
8　　　third-party stuff.  I'd go straight to the
9　　　family.
10　Q.　Good.  Would you have notified your principal?
11　A.　Yes.
12　Q.　And you would have documented that notification
13　　　with a writing somehow, an e-mail or something?
14　A.　It depends.  You know, sometimes it's just
15　　　matter of what's the easiest way to get ahold
16　　　of that individual.
17　Q.　Okay.  Has any disciplinary action been taken
18　　　against Mr. Plumb or Mr. Ranochak in response
19　　　to not bringing these allegations to your
20　　　attention in December of 2017?
21　A.　No, sir.
22　　　　　　MR. LITTLE:  Okay.  All right.  Let's
23　　　move on to 3306.
24　　　　　　(WHEREUPON, Deposition Exhibit 5 was
25　　　marked for identification.)

**48**

1　　　　　　MS. OLSHEMSKI:  Jon, do you mean 3036?
2　　　　　　MR. LITTLE:  No -- yes, yes, 3036.  I'm
3　　　sorry.
4　　　　　　MS. OLSHEMSKI:  Okay.
5　　　BY MR. LITTLE:
6　Q.　Who is --
7　　　　　　MS. SCHNELKER:  Let me have one second
8　　　just to read through.
9　　　　　　MR. LITTLE:  Sure.  Yeah.
10　　　　　　MS. SCHNELKER:  Okay.  Sorry, Jon.  Go
11　　　ahead if the witness is ready.
12　　　BY MR. LITTLE:
13　Q.　Sir, have you had a second -- yeah.  Who's
14　　　████████
15　A.　████████  was a student athlete within our
16　　　program that has since graduated.
17　Q.　Why is he -- why did he get banned from USA
18　　　Swimming, if you know?
19　A.　I don't recall the specifics of that, but it
20　　　was something while he was a juvenile with
21　　　another student.
22　Q.　Of a sexual nature?
23　A.　That's my recollection, yes.
24　Q.　Okay.  Was he banned from Carmel High School
25　　　Swimming?

**49**

1　A.　No, he was not.
2　Q.　Why not?
3　A.　At that time, my recollection was we did not
4　　　have any basis to be able to withhold him from
5　　　that extracurricular.
6　Q.　Was it -- I mean, do you remember anything
7　　　about the allegation?
8　A.　I really do not.  I'm sorry.
9　　　　　　MR. LITTLE:  Okay.  Can we see 2202?  So
10　　　mark that one as Exhibit 5, I'm sorry.
11　　　　　　MS. OLSHEMSKI:  Yes, I got it.
12　　　　　　(WHEREUPON, Deposition Exhibit 5 was
13　　　marked for identification.)
14　　　BY MR. LITTLE:
15　Q.　Okay.  All right.  2202.  Who is ██████?
16　A.　I know that is the last name of a student
17　　　athlete that was in our program.  I think male
18　　　and female, they had both in the swimming and
19　　　diving program.
20　Q.　Was there any allegations of sexual misconduct
21　　　or harassment involving the ████?
22　A.　If there was, I don't recall.  One was a --
23　　　one was a girl diver and the boy -- I'm not
24　　　sure.  Nothing that's striking a chord right
25　　　now.

13  (Pages 46 to 49)

Jim Inskeep
February 23, 2021

50

1  Q.  Okay.  Were they -- were either of the ███████
2  ever removed from the swimming program?
3  A.  I don't think the girl was.  But I seem to
4  recall there might have been something with
5  attendance or behavior with the boy.
6  Q.  But nothing like a rape or anything?
7  A.  Not -- no, nothing to that level that I can
8  remember, no.
9      MR. LITTLE:  Gaby, can you put up 2075?
10 We'll mark this as Exhibit 6.
11     (WHEREUPON, Deposition Exhibit 6 was
12 marked for identification.)
13     MS. SCHNELKER:  I'm sorry, I thought 2202
14 was Exhibit 6.
15     MS. OLSHEMSKI:  Yeah, 2175 is going to be
16 Exhibit 7.
17     MR. LITTLE:  All right.  Thank you.
18     (WHEREUPON, Deposition Exhibit 7 was
19 marked for identification.)
20     MS. SCHNELKER:  I'll just note that
21 Exhibit 6 and Exhibit 7, neither of them
22 involve Mr. Inskeep's e-mails that I can see.
23 You can answer the questions.
24 BY MR. LITTLE:
25 Q.  I'm just -- do you have any -- does this -- do

51

1  you have any recollection about what was going
2  on here with ███████, maybe, or ███████
3  ███████?
4  A.  Connor is -- Connor is Connor Bradley, who was
5  a member of the staff at that time and a
6  teacher in our building.  So it's Connor
7  Bradley and ███████.
8  Q.  Okay.  Any idea what's going on here?
9  A.  Nothing that -- nothing that is jogging my
10 memory, no.
11 Q.  Okay.  Let's turn towards other Carmel coaches.
12 Do you know -- Carmel maintains an athletic
13 Hall of Fame, correct?
14 A.  Yes.
15 Q.  Okay.  What coaches are in the Carmel Athletic
16 Hall of Fame?
17 A.  I'd have to go ahead and look that up to see
18 the complete list of them.
19 Q.  Okay.  So Chuck Koeppen from cross country is
20 in the Carmel Athletic Hall of Fame?
21 A.  Yes, sir.
22 Q.  Okay.  I think there was a basketball coach, a
23 woman's basketball coach in there?
24 A.  Yes.
25 Q.  What's her name, if you remember?

52

1  A.  Sharon Eskew.
2  Q.  Okay.  And there's a swim coach in there, Ray
3  Lawrence, correct?
4  A.  Yes.
5  Q.  Okay.  And the Carmel girls swim team started
6  in 1979, right?
7  A.  That sounds about right.
8  Q.  And they've won every girls State Championship
9  since, correct?
10 A.  No, sir.
11 Q.  Which one did they not win?
12 A.  That streak started in 1986.
13 Q.  Oh, okay.  So they didn't win consecutively
14 from '79 to '86?
15 A.  Correct.
16 Q.  Okay.  They've won every one since 1986, then,
17 is that right?
18 A.  Yes.
19 Q.  Okay.  And Ray Lawrence was the coach when that
20 started, correct?
21 A.  Yes, sir.
22 Q.  Now, you know Ray Lawrence is banned for life
23 from United States Swimming, correct?
24 A.  That is my understanding, yes.
25 Q.  Okay.  When did you become aware of that fact?

53

1  A.  When that became public information.
2  Q.  Which was about 2010?
3  A.  That sounds about right, in and around that
4  time period.
5  Q.  Okay.  But how did you become aware of that, if
6  you remember?
7  A.  My recollection was that his name was added to
8  the list.  I can't remember if I was notified
9  at that time.  It's been 11 years ago.  But I
10 became aware that he was on the list but did
11 not receive any information further than that.
12 Q.  And do you know why Mr. Lawrence was banned?
13 A.  No, I do not.
14 Q.  It's -- do you know -- you don't know that it's
15 for raping the children he coached?
16 A.  No, I do not have that information.
17 Q.  Are you aware of any Carmel students raped by
18 Mr. Lawrence while he was teaching English and
19 coaching girls swimming at Carmel High School?
20 A.  No.
21 Q.  Have you ever spoken to any students who
22 claimed they were raped by Ray Lawrence while
23 he was teaching English and coaching girls
24 swimming at Carmel High School?
25 A.  No, I have not.

Fillenwarth Reporting Service
317.345.6179

Jim Inskeep
February 23, 2021

---

54

1    Q.  Why is he still in the athletic hall of fame?
2         MS. SCHNELKER:  Objection, lack of
3    foundation.  You can answer.
4    A.  Sure.  We have not removed anyone's pictures
5    from the Hall of Fame.
6         BY MR. LITTLE:
7    Q.  Now, who decides who gets into the Carmel High
8    School Hall of Fame?
9    A.  It was a collective conversation in my time
10   period, which was established before I started,
11   the athletic director, assistant athletic
12   director, any other various administrators we
13   would pull in, including the principal.
14   Q.  Okay.  So from -- in -- who was the athletic
15   director of Carmel high school while
16   Mr. Lawrence was coaching girls swimming?
17   A.  That would have been William Shepherd.
18   Q.  Okay.  When did Mr. Lonso start coaching -- or
19   become the athletic director?
20   A.  In the fall of 1992.
21   Q.  Okay.  Is Mr. Shepherd still alive?
22   A.  He is not.
23   Q.  Have you ever spoken to Ray Lawrence?
24   A.  Not about this.  I know Ray Lawrence just from
25   him being a coach and an administrator at

---

55

1    Speedway schools.  But, no, nothing more than
2    hi.
3    Q.  When was last time you spoke to Mr. Lawrence?
4    A.  I do not recall, but I have not seen him since
5    the time of the -- of that USA Swimming
6    notification.
7    Q.  Okay.  Do you know if the Carmel schools have
8    paid money to any of the students that
9    Mr. Lawrence raped?
10   A.  Not to my recollection.  I do not know.
11   Q.  Do you know why Mr. Lawrence was removed as the
12   girls swim coach from Carmel High School?
13   A.  No, I have no knowledge of that.
14   Q.  Do you know that when he was removed as girls
15   swim coach, he still coached the boys?  Did you
16   know that?
17   A.  That's my understanding on the timeline, yes.
18   Q.  Do you have any idea why Mr. Lawrence left the
19   Carmel Clay School system?
20   A.  No, I do not.
21   Q.  Do you know a coach named Richard Rice?
22   A.  Yes, I'm familiar with that name.
23   Q.  Mr. Rice was a former Carmel High School swim
24   coach, correct?
25   A.  Yes.  He was a member of the staff predating my

---

56

1    time period.
2    Q.  I thought you started in '97?
3    A.  No, I did not.
4    Q.  When did you start as a -- being employed from
5    the Carmel School District?
6    A.  I started employment in '97, but I was not the
7    athletic director.
8    Q.  What was your job in '97?
9    A.  Teaching sixth grade reading.
10   Q.  Okay.  And then what was your job in 1998?
11   A.  Sixth grade social studies.
12   Q.  1999?
13   A.  I would have been seventh grade social studies.
14   Q.  2000.
15   A.  '99-2000, I would have been seventh grade
16   social studies at Carmel Junior High.
17   Q.  Okay.  2001?
18   A.  Carmel High School.
19   Q.  Okay.  So was Ray Lawrence a Carmel High School
20   coach in 2001 -- or not Ray Lawrence, strike
21   that.  Richard Rice?
22   A.  Not to my recollection.  I believe he had
23   stepped away from coaching maybe the year
24   before.
25   Q.  Did you know Mr. Rice?

---

57

1    A.  No, only that he was a member of the teaching
2    staff here at the school at the time and had
3    previously served on the Swim Club staff.
4    Q.  And --
5    A.  The high school staff, I mean.
6    Q.  Who was the athletic director, then, in
7    2001-2002 school year?
8    A.  I was the athletic director.  That was my first
9    year.
10   Q.  Okay.  Let's talk about Mr. Rice.  Mr. Rice was
11   charged criminally for raping his swimmers,
12   correct?
13   A.  My understanding, yes, he was going to be
14   charged with one student athlete who had been
15   a -- not -- I don't know if it was a student
16   athlete or a student in his class.  I'm not
17   sure that individual was part of the swim team.
18   But was certainly a class member of his
19   teaching math.
20   Q.  And Mr. Rice committed suicide, correct?
21   A.  Yes, shortly after the allegations were made
22   public.
23   Q.  Okay.  Have you spoken to the victim of
24   Mr. Rice?
25   A.  No.

---

15 (Pages 54 to 57)

Jim Inskeep
February 23, 2021

58

1    Q.  Do you know if the Carmel School Corporation
2         paid her any money?
3    A.  Not to my knowledge.
4    Q.  Was her -- was her name ████ , by chance?
5    A.  I do not know what the name was.
6    Q.  Okay.  Besides Mr. Lawrence, Mr. Goelz, and
7         Mr. Rice, are you aware of any other Carmel
8         Swim Club -- or strike that -- Carmel High
9         School swim coaches who have had sex with their
10        athletes?
11             MS. SCHNELKER:  I'm going to object just
12        to the extent that he testified that he wasn't
13        aware of any inappropriate relationships
14        concerning Ray Lawrence.  But you can answer.
15   A.  No.
16        BY MR. LITTLE:
17   Q.  Okay.  Now, are you aware of any other Carmel
18        High School swim coaches who have been charged
19        with criminal conduct involving not reporting
20        sexual abuse of their athletes?
21   A.  Not to my understanding.
22   Q.  Do you know Tony Young?
23   A.  Yes, I do.
24   Q.  Okay.  How do you know Mr. Young?
25   A.  He currently works with Indiana Swimming.  He

59

1         was a former swim coach at Carmel High School
2         before my time.
3    Q.  Okay.  Do you know if Mr. Young was ever
4         charged criminally for failing to report sexual
5         misconduct against a swimmer?
6    A.  I have seen that information, but I was not a
7         party to that.
8             MR. LITTLE:  Okay.  Gaby, can you put
9         that on the screen?
10            (WHEREUPON, Deposition Exhibit 8 was
11        marked for identification.)
12            MR. LITTLE:  Put up Indy Star, the 6591,
13        please.  While she's getting that --
14            MS. OLSHEMSKI:  Is that the newspaper
15        clipping?
16            MR. LITTLE:  Yes, yes.  Yes, Gaby.  Yep.
17        Okay, perfect.  Can you -- can you rotate it,
18        maybe?
19            MS. OLSHEMSKI:  It's not -- sorry.
20            THE WITNESS:  I can -- I can see that if
21        it's all right.
22            MR. LITTLE:  Okay.  All right.  Well, can
23        you possibly get the date on there, Gaby?
24            MS. OLSHEMSKI:  Yeah.
25            MR. LITTLE:  I'd just like to note for

60

1         the record that the Carmel Clay School
2         Corporation has marked an Indy Star article as
3         confidential.
4             MS. SCHNELKER:  Hey, Jon, I'm just going
5         to respond to that.  This entire file has been
6         marked as confidential because it concerns the
7         materials of a former employee.
8             MR. LITTLE:  Well, I am going to take up
9         the designation of an Indy Star article as
10        confidential.  I think that you need to be
11        judicious in your marking of documents as
12        confidential.
13        BY MR. LITTLE:
14   Q.  All right.  Did you ever speak to Mr. Young
15        about the allegations that he failed to report
16        the sodomy of one of his athletes?
17   A.  No, I have not.
18   Q.  Okay.  Do you know if any disciplinary action
19        was taken against Mr. Young for failing to
20        report the sodomy of one of his athletes?
21   A.  Just what I see in the article here from
22        Hamilton County.  But, no, I was not -- no
23        firsthand knowledge of that.
24   Q.  Okay.  Did -- was Mr. Young ever a swim coach
25        while you were athletic director?

61

1    A.  No, sir.
2    Q.  Okay.  Did you -- do you know if the Carmel
3         Clay School Corporation wrote Mr. Young any
4         letters of recommendation for other employment?
5    A.  I do not know the answer to that.
6    Q.  Have you written Mr. Young any letters of
7         recommendation for other employment?
8    A.  No, I have not.
9             MR. LITTLE:  Okay.  Let's -- you can take
10        that down.
11        BY MR. LITTLE:
12   Q.  How did you become aware of the allegations
13        that Mr. Young had failed to report sexual
14        misconduct?
15   A.  I subscribed to the Indianapolis Star at that
16        time.
17   Q.  Okay.  So that's -- you -- first time you read
18        about it was in the newspaper?
19   A.  Yes, sir.
20   Q.  Do you know anything about those allegations?
21   A.  Just what I read in the paper.
22   Q.  You have no independent knowledge of the
23        substance of those allegations?
24   A.  No.
25   Q.  Okay.  So the swim coach, when you became

16  (Pages 58 to 61)

Jim Inskeep
February 23, 2021

62

1    athletic director, was Ken Stopkotte, correct?
2  A.  Yes, he was hired in 2000-2001.
3  Q.  Okay.  And why was -- how long did
4    Mr. Stopkotte serve as Carmel swim coach?
5  A.  Three years, I believe.
6  Q.  Okay.  And why did he leave the Carmel Clay
7    School Corporation?
8  A.  Mr. Stopkotte had a falling out with the Carmel
9    Swim Club board over some receipts and not
10    having authorization to use expenditures, and
11    it was kind of a larger part of a, for lack of
12    a better term, not a lot of confidence in his
13    leadership.  So that was with the Swim Club.
14    And as that became knowledge to the Carmel High
15    School, he resigned or was fired from Carmel
16    Swim Club but was still the Carmel High School
17    coach at that time period for a period of a
18    month or two while we tried to sort things out.
19    And then Mr. Stopkotte resigned from our
20    position as well.
21  Q.  Okay.  Now, where did he go after that?
22  A.  Now, I believe Mr. Stopkotte may have left the
23    state at that point.  I'm not real clear on his
24    whole timeline.
25  Q.  Did he -- he went to Fishers.

63

1  A.  I do know he spent time in Tennessee.  May have
2    gone back to Ohio.  At some point he returned
3    to Fishers High School as their swim coach.
4  Q.  Okay.  So, and he was at Fishers and he
5    ultimately -- are you aware of Mr. Stopkotte
6    appearing on 20/20, the news program 20/20?
7  A.  Yes.
8  Q.  Okay.  What did Mr. Stopkotte go on 20/20
9    about, if you remember?
10  A.  My recollection is that Mr. Stopkotte spoke to
11    sexual abuse within USA Swimming, and that's
12    kind of the summary of it.
13  Q.  He said it was a problem in United States
14    Swimming, correct?
15  A.  That's my recollection, yes.
16  Q.  Okay.  And then shortly thereafter, he was
17    terminated by USA -- he was banned for life by
18    USA Swimming.  Are you aware of that?
19  A.  I am not aware of the timing of all that, no.
20  Q.  Okay.  But you're aware --
21  A.  I do know that he had other things that led to
22    his time in prison.
23  Q.  Right.  That's -- I'm coming up to that.
24  A.  Okay.
25  Q.  So he was banned from United States Swimming.

64

1    Banned from Indiana Swimming, you're aware of
2    that?
3  A.  That's my recollection, that there was several
4    things that led into that because of his
5    criminal cases.
6  Q.  And he -- and he was charged criminally in
7    Hamilton County, correct?
8  A.  I believe so.
9  Q.  And he was exonerated, correct?
10  A.  But I don't -- but I'm not for certain on that.
11    I think there was something at Fishers High
12    School.  But, again, only what I read in the
13    Indianapolis Star.
14  Q.  Okay.  When was the last time you spoke to
15    Mr. Stopkotte?
16  A.  I do not recall, but it's been a long time ago.
17  Q.  Okay.  Have you ever --
18  A.  Like maybe ten years.
19  Q.  Have you ever spoken to Buddy Pylitt about
20    Mr. Stopkotte?
21  A.  Yes, I'm fairly certain I did.
22  Q.  When was that conversation?
23  A.  Mr. Pylitt and I have spoken about
24    Mr. Stopkotte along the way in terms of other
25    situations that have come up with him.

65

1  Q.  Like what?
2  A.  As he has been arrested and has been indicted.
3    I believe he was extradited at one time as
4    well.
5  Q.  And those were for drug offenses, correct, for
6    cocaine, stealing from churches to get money to
7    buy cocaine?
8  A.  I do not know the specifics of it.  I know he's
9    had a lot of things that have not gone very
10    well.
11  Q.  All right.  So how often do you talk to Buddy
12    Pylitt?
13  A.  About once a year.
14  Q.  And was this text message recently is about --
15    is that your typical once-a-year contact with
16    Mr. Pylitt?
17  A.  Yes, sir.
18  Q.  How many conversations do you believe you had
19    with Mr. Pylitt concerning Mr. Stopkotte?
20  A.  I can't put a number on that, but I wouldn't
21    say numerous.  I would say a few.
22  Q.  Less than a dozen?
23  A.  Yes, likely.
24  Q.  Are you aware of any other Carmel coaches that
25    have been charged criminally for sexual

17 (Pages 62 to 65)

66

1    misconduct with a minor or failing to report
2    sexual activity with a minor besides the
3    coaches we've discussed?
4    A.   Yes.
5    Q.   Okay.
6    A.   Yes.
7    Q.   Go ahead.  And who are they?
8    A.   Sure.  At the time of my hire as the athletic
9    director in July of 2001, we had three arrests
10   for coaches/teachers that had relationships
11   with students, and that was all within a
12   two-month or so time period.
13        So the one you referenced earlier,
14   Richard Rice, was, I believe, the third of
15   those.
16        Also at that time period was the girls
17   basketball head coach, Don Renihan, with a
18   student athlete under his direction that had
19   followed him from school to school.  Actually
20   from other schools to our school upon his
21   hiring before my hire in the athletic office.
22        And then also a Rick Doucette.  And Rick
23   Doucette was a freshman boys soccer coach
24   caught in the parking lot giving or receiving
25   oral sex with a 15-year-old student athlete.

67

1    Q.   Okay.  And then after those coaches, then you
2    had some kind of -- you terminated Josh Trisler
3    for this sports bra incident?
4    A.   Yes, that's my recollection.
5    Q.   Okay.  After that, do you -- are you aware of
6    any other coaches that you -- that have been
7    accused of sexual -- not accused.  Are you
8    aware of any other coaches that have been
9    arrested for sexual impropriety with Carmel
10   students?
11   A.   No.
12   Q.   Are you aware of any other coaches that have
13   been arrested for sexual impropriety with any
14   children?
15   A.   No.
16   Q.   Are you aware of any other coaches who have
17   been arrested -- or not arrested, but who have
18   been terminated by the Carmel School
19   Corporation for sexual inappropriate contacts
20   with students?
21   A.   No.
22   Q.   So your testimony is between Mr. Trisler and
23   Mr. Goelz, no other Carmel coaches have been
24   terminated for sexual impropriety with
25   students?

68

1    A.   Correct, that's my recollection.
2    Q.   Okay.  And as far as you know, Carmel has not
3    paid any settlements or monies to any victims
4    of alleged sexual improprieties between Carmel
5    coaches and students after Mr. Trisler and
6    before Mr. Goelz?
7    A.   I'm not familiar with any of those.  I'm not a
8    party to that.
9    Q.   Who would be most familiar with -- if there
10   were any, who would be most familiar with them?
11   A.   That would need to come from our
12   superintendent's office and any records that
13   are kept there.
14   Q.   And who is the superintendent now?
15   A.   The current superintendent is Dr. Michael
16   Beresford.
17   Q.   And when did he start?
18   A.   I believe he has been here three and a half
19   years now, two or -- his first month on the job
20   was at the time of Mr. Goelz's arrest.  So
21   starting in the fall of 2017.
22   Q.   And who was his predecessor?
23   A.   I'm sorry, I'm sorry, I'm wrong on that.  The
24   fall of 2018.
25   Q.   Okay.

69

1    A.   Yeah, I'm sorry.
2    Q.   Yeah, after Mr. Goelz's arrest, okay.
3    A.   Yes.
4    Q.   Who was his predecessor?
5    A.   Well, we went through an interim year of
6    co-superintendents, which was Amy Dudley and
7    Roger McMichael, and then prior to that was
8    Nicholas Wahl.
9    Q.   And why did Mr. Wahl leave Carmel?
10   A.   Nicholas Wahl was deemed unfit for the position
11   by the school board because of his relationship
12   with the human resource director that he had
13   hired.
14   Q.   He was having a sexual relationship with the
15   human resource director, correct?
16   A.   That's my understanding.
17   Q.   And when did Mr. Wahl start as the Carmel
18   superintendent?
19   A.   I believe around four years, maybe.  I could be
20   off by a year.  Four to five.
21   Q.   So that's about 2010?
22   A.   No, he was not in 2010.  So it would have been
23   around 2013-ish, 2014.
24   Q.   Okay.  Who was his predecessor?
25   A.   Jeff Swenson was the superintendent before

18 (Pages 66 to 69)

Jim Inskeep
February 23, 2021

---

70

1  that.
2  Q. And how long was Mr. Swenson superintendent?
3  A. About a three to four time -- three- to
4     four-year time period.
5  Q. Okay. And who was his predecessor?
6  A. This is tough.
7     MS. SCHNELKER: You didn't know you were
8     going to get quizzed, huh?
9  A. Yeah. Barbara Underwood was his predecessor
10    for a period of about six -- about seven years.
11    BY MR. LITTLE:
12 Q. Okay. And that's -- and then was she who was
13    superintendent when you were hired?
14 A. Yes, I believe so.
15 Q. Okay.
16 A. No, sorry. Ernie Husrick (phonetic) was the
17    superintendent for one year from 2000 to 2001.
18    And at the time of my hire, Mr. Husrick was
19    never -- was not superintendent, and I don't
20    know that one had been named yet at that time.
21 Q. Okay. Now, have there been -- there have been
22    incidences of kid-on-kid sexual misconduct in
23    the Carmel School Corporation between 2002 and
24    2018, correct?
25 A. Yes, sir.

---

71

1     MS. SCHNELKER: I'm just going to show a
2     running objection to relevance. But you can go
3     ahead and ask.
4     BY MR. LITTLE:
5  Q. Okay. Now, have any of those resulted in
6     lawsuits?
7  A. Yes, I'm sure they have.
8  Q. Okay. So let's go through. Which ones do you
9     know have resulted in lawsuits?
10 A. The one that's most sticking out in my mind was
11    2010-ish school year, which would have been
12    resulting from our boys basketball program.
13 Q. Okay. And there was a -- there was a
14    lawsuit -- that was where they -- the
15    basketball players allegedly put a pencil in
16    a -- in the manager's butt and perforated his
17    colon?
18 A. I think there's evidence to the contrary, but
19    there's a lot of information that would be some
20    sort of skin-to-skin contact there between
21    student athletes.
22 Q. Okay. And was there a settlement in that case?
23 A. If there was, I'm not aware of it.
24 Q. Were you deposed in that case?
25 A. No, I was not.

---

72

1  Q. Okay. What other incidences are you aware of
2     that resulted in lawsuits?
3  A. That's the one that sticks out most to me. I'm
4     sure there are others, but that's the one that
5     I have the most recollection of.
6  Q. Okay. If I wanted to get a list of all the
7     settlements that the Carmel School Corporation
8     has been a party to from 2002 to 2018, who
9     should I ask for that?
10 A. I would contact the superintendent's office.
11    MR. LITTLE: Okay. Let's take a -- about
12    a five-minute break. I'm almost done.
13    THE VIDEOGRAPHER: Okay. This is the
14    videographer. We're going off the record at
15    11:15.
16    (WHEREUPON, at this time a brief recess
17    was taken.)
18    THE VIDEOGRAPHER: This is the
19    videographer. We're going back on the record.
20    It is 11:21.
21    BY MR. LITTLE:
22 Q. Sir, when you were teaching sixth and seventh
23    grade reading, did you coach any sports?
24 A. Yes, I coached at Carmel Junior High.
25 Q. Okay. And what sports?

---

73

1  A. I coached football in the fall and basketball
2     in the winter.
3  Q. Okay. And when was the last time you were a
4     coach?
5  A. For the school district, would have been in the
6     1999-2000 year. Since that time period, I've
7     coached about 25 different teams with my own
8     children.
9  Q. And in what kind of sports?
10 A. Well, baseball, basketball.
11 Q. Okay. Let's go one at a time.
12 A. Soccer.
13 Q. Let's slow down. Let's go back to baseball.
14    In baseball, was it Little League?
15 A. Yes, sir.
16 Q. Okay. And did you receive SafeSport training
17    as part of your Little League coaching
18    responsibilities?
19 A. No, I did not at that time.
20 Q. Okay. Okay, keep going.
21 A. Basketball.
22 Q. Okay. In what organization?
23 A. Carmel Dads' Club.
24 Q. Okay. Did the Carmel Dads' Club provide any
25    SafeSport training?

---

19 (Pages 70 to 73)

Jim Inskeep
February 23, 2021

74

1   A.  Not to my recollection.
2   Q.  Okay.  Keep going.
3   A.  Let's see.  I talked about baseball.  Soccer.
4   Q.  Was that with USA Soccer?
5   A.  No, it was not.  Carmel Dads' Club.
6   Q.  Okay.  And when you coached soccer, did they
7       provide any SafeSport training?
8   A.  No.
9   Q.  When was the last time you coached youth
10      sports?
11  A.  It would have been four years ago.
12  Q.  Okay.  And what sport was that?
13  A.  Basketball.
14  Q.  And who was the organization that you coached
15      with?
16  A.  Through the Carmel Dads' Club.
17  Q.  Did they provide SafeSport training at that
18      time?
19  A.  Not to my knowledge.
20  Q.  Okay.  All right.  Turning toward Ray Lawrence,
21      you could -- could you remove Ray Lawrence from
22      the Carmel Hall of Fame?
23  A.  Yes, we could do that.
24  Q.  Okay.  And is that something you guys are
25      considering doing?

75

1   A.  We have not had a recent conversation about it.
2       But that is something that we could do.
3   Q.  Do you think it's appropriate that Mr. Lawrence
4       is in the Carmel Athletic Hall of Fame given
5       him being banned for life from USA Swimming for
6       having sex with a child?
7           MS. SCHNELKER:  Objection to the
8       characterization.  You can go ahead and answer.
9   A.  I don't know that I'm ready to answer that
10      question, honestly.  I think there -- the
11      accomplishments as a coach have been what's
12      been up on the wall and not the personal
13      background of those coaches.
14      BY MR. LITTLE:
15  Q.  Okay.  But, I mean, at some point, the cost of
16      winning is not worth it, right?
17  A.  Absolutely.  Absolutely, it's not worth it.
18  Q.  Do you think that sets a good example for Ray
19      Lawrence to still be in the Carmel Hall of Fame
20      given his public ban from United States
21      swimming for sexual misconduct with a minor?
22  A.  I can't speak to how he thinks about it.
23  Q.  No, no, no, I meant for the -- for the students
24      at your high school, when they look up at the
25      high school Hall of Fame, I believe there's

76

1       only three coaches in there.  He was one of
2       them.  Do you think that's a good example for
3       the kids?
4   A.  I don't think his position up on the wall is
5       one that is looked at by our kids.  I will say
6       that, you know, throughout the course of all
7       the pictures that are in our school, there are
8       various coaches that are been removed from
9       positions for a variety of reasons, and student
10      athletes who have gone on to have
11      transgressions past their high school years,
12      that are still up on the walls and those have
13      not been removed.
14  Q.  Okay.  You've been an athletic director in
15      Indiana now for al- -- 20 years, right?
16  A.  Yes.
17  Q.  Okay.  You talk to athletic directors from
18      other high schools, correct?
19  A.  Yes.
20  Q.  Other large high schools, correct?
21  A.  Yes.
22  Q.  Okay.  Do you know of any high school in
23      Indiana that has had three swim coaches
24      convicted of having sex with their children?
25          MS. SCHNELKER:  Objection to the

77

1       characterization.
2           MR. LITTLE:  Yeah, I want to make sure
3       you answer that question correctly.
4       BY MR. LITTLE:
5   Q.  Okay.  Do you know of any -- of any other high
6       school in Indiana that has had three swim
7       coaches found to have engaged in sexual conduct
8       with their students?
9           MS. SCHNELKER:  Same objection.
10  A.  No, but I've also not been tracking that data.
11      BY MR. LITTLE:
12  Q.  Do you know of any other high school that's had
13      two?
14  A.  No, but I've not been tracking that data.
15  Q.  Okay.  Do you know of any other high school
16      that's had a swim coach arrested for failing to
17      report sexual misconduct?
18  A.  No.
19          MR. LITTLE:  Okay.  I don't have any
20      further questions.
21          MS. SCHNELKER:  I don't have anything for
22      you.  That's it.  We're going to review and
23      sign.
24          MR. LITTLE:  Okay.
25          THE VIDEOGRAPHER:  This is the

20  (Pages 74 to 77)

78

1   videographer.  This will mark the end of Media
2   2 and the deposition of Jim Inskeep.  We're
3   going off the record at 11:26.

5         (Deposition concluded at 11:26 a m.)

80

1   PAGE  LINE CHANGE
2
3   ____ ____ _____
4         REASON: _____
5   _____
6         REASON: _____
7   ____ ____ _____
8         REASON: _____
9   _____
10        REASON: _____
11  ____ ____ _____
12        REASON: _____
13  _____
14        REASON: _____
15  ____ ____ _____
16        REASON: _____
17  _____
18        REASON: _____
19  ____ ____ _____
20        REASON: _____
21
22
23  JIM INSKEEP
24  _____
25  (Sign here if changes made.)

79

1              - - - - - -
               E R R A T A
2              - - - - - -

4   PAGE  LINE CHANGE
5   _____
6         REASON: _____
7   _____
8         REASON: _____
9   _____
10        REASON: _____
11  _____
12        REASON: _____
13  _____
14        REASON: _____
15  _____
16        REASON: _____
17  _____
18        REASON: _____
19  _____
20        REASON: _____
21  _____
22        REASON: _____
23  _____
24        REASON:
25

81

1       ACKNOWLEDGMENT OF DEPONENT
2
3         I, JIM INSKEEP, do
4   hereby certify that I have read the
5   foregoing pages, and that the same is
6   a correct transcription of the answers
7   given by me to the questions therein
8   propounded, except for the corrections or
9   changes in form or substance, if any,
10  noted in the attached Errata Sheet.
11
12
13  _____
14  JIM INSKEEP              DATE
15
16
17
18
19
20
21
22
23
24
25

21  (Pages 78 to 81)

82

1    STATE OF INDIANA   )
2                       ) SS:
3    COUNTY OF JOHNSON  )
4
5              CERTIFICATE
6
7        I, Valerie Fillenwarth, RPR, a Notary
8    Public in and for the County of Johnson, State
9    of Indiana, maintaining an office in Johnson
10   County, Indiana, do hereby certify the
11   following:
12
13       That the witness herein, JIM INSKEEP, was
14   first duly sworn to tell the truth, the whole
15   truth and nothing but the truth in the
16   foregoing deposition;
17
18       That all testimony was taken down in
19   stenographic notes and afterward reduced to
20   typewritten form under my direction and then
21   presented to counsel for the purpose of
22   obtaining the deponent's signature;
23
24       That I recorded and transcribed any and
25   all objections made by counsel and the reasons

83

1    therefore; and
2
3        That I am not a relative or employee,
4    attorney or counsel of any of the parties, nor
5    a relative or employee of such attorney or
6    counsel, nor am I financially interested in
7    this action.
8
9        IN WITNESS HEREOF, I have hereunto set my
10   hand and affixed my Notarial Seal this 1st day
11   of March 2021.
12
13
14
15
16
17       Valerie Fillenwarth, RPR
18       Notary Public
19
20
21
22
23   Commission Number:  NP0669434
24   County of Residence:  Johnson
25   My Commission Expires on:  June 22, 2023