UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| GABRIELA NIEVES, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Cause No: 1:20-cv-00320-JMS-DML |
| CARMEL CLAY SCHOOLS, | ) ) ) |
| Defendant. | ) ) |

**NON-PARTY RAYMOND M. LAWRENCE'S REPLY IN SUPPORT OF
MOTION TO QUASH SUBPOENA TO
TESTIFY AT A DEPOSITION IN A CIVIL ACTION**

Non-party Raymond M. Lawrence, by counsel, respectfully files this reply in support of his *Motion to Quash Subpoena to Testify at a Deposition in a Civil Action* [Dkts. 97–98] and requests that the Court quash the *Subpoena to Testify at a Deposition in a Civil Action* served on him in this matter. In support of this Motion, Mr. Lawrence states as follows:

**I. INTRODUCTION**

In *Plaintiff's Response in Opposition to Ray Lawrence's Motion to Quash* [Dkt. 102], Plaintiff Gabriela Nieves essentially admits that she is conducting a fishing expedition in hopes that something else will somehow turn up that is relevant to this case. What is her support for this fishing expedition into over 40-year-old information and documents? Newspaper articles that are completely inadmissible hearsay, none of which show any connection between Mr. Lawrence and this case, and manufactured claims of relevance, which are simply false. In short, Mr. Lawrence has no evidence that relates to this case, and as such, the non-party

1

*Subpoena to Testify at a Deposition in a Civil Action* [Dkt. 98-1] poses an undue burden on Mr. Lawrence and should be quashed.

Ultimately, there are no connections between Mr. Lawrence and the events of this case, and Ms. Nieves's discovery method of metaphorically throwing everything at the wall to see what sticks is precisely the type of fishing expedition that Fed.R.Civ.P. 45(d)(3)(A)(iv) seeks to prohibit as an undue burden. Thus, the Court should quash the Subpoena in its entirety.

## II. LEGAL ARGUMENT

**A. Mr. Lawrence clearly explained what the undue burden created by the Subpoena is: the lack of any bearing on any party's claims or defenses. Ms. Nieves simply ignores the substance of this argument.**

Mr. Lawrence argued that the Subpoena was unduly burdensome because it sought information and documents that had no relevance to this lawsuit. Multiple courts have found that where nonparty discovery is involved, non-parties are entitled to "greater protection," and "the possibility of mere relevance may not be enough" to pursue non-party discovery. *Patterson v. Burge*, No. 03 C 4433, 2005 U.S. Dist. LEXIS 1331, at *5 (N.D. Ill. Jan. 5, 2005) (quotation omitted). As the information and documents sought by the Subpoena lack any relevance to any party's claims or defenses in this case, it is this clear lack of relevance that creates an undue burden, not Mr. Lawrence's availability for such a deposition. *E.g.*, *Earthy, LLC v. BB&HC, LLC*, No. 16 CV 4934, 2017 U.S. Dist. LEXIS 167200, at *9-10 (N.D. Ill. Oct. 10, 2017).

Nonetheless, Ms. Nieves attempts to redefine what constitutes an undue burden to a nonparty by couching it as needing to cause Mr. Lawrence an "inordinate amount of time,

cause him an unallowable level of inconvenience, or result in a loss of income to him." [Dkt. 102 at 3]. Ms. Nieves ignores that although "[r]elevance is measured by the same broad standard that applies under FRCP 26," "discovery from non-parties is not as broad as is discovery from parties." *Methodist Health Servs. Corp. v. Osf Healthcare Sys.*, No. 13-1054, 2014 U.S. Dist. LEXIS 203122, at *5-6 (C.D. Ill. Jan. 8, 2014).

If a subpoena seeks completely irrelevant information from a non-party, it is subject to quashing by this Court. Here, in attempting to piece together some relevance of the Subpoena to this case, Ms. Nieves spins a conspiracy theory—without the benefit of any evidence. Indeed, on multiple occasions within her response, Ms. Nieves fails to accurately convey both Mr. Lawrence's involvement with Carmel as well as Carmel's production of documents in this case.

Because Ms. Nieves cannot "establish a compelling need for documents from [the non-party] that it has requested or could request from the Defendants . . . ," and the "requests impose a [sic] undue burden of litigation on a non-party because they are overbroad and include irrelevant information," the Court should quash the *Subpoena to Testify at a Deposition in a Civil Action. Tresóna Multimedia, LLC v. Legg*, No. 15 C 4834, 2015 U.S. Dist. LEXIS 107723, at *15-16 (N.D. Ill. Aug. 17, 2015).

**B.    Ms. Nieves's factual assertions and entire bases for pursuing documents and information from Mr. Lawrence are cobbled together with completely inadmissible hearsay and completely false allegations against Mr. Lawrence.**

> **1. Beyond the fact that the newspaper and media articles cited by Ms. Nieves have no bearing on the Court's consideration of this non-party Subpoena to Mr. Lawrence, they are furthermore inadmissible hearsay.**

3

Much of Ms. Nieves's Response is based on unauthenticated news articles, which constitute inadmissible hearsay, not evidence. Ms. Nieves quotes from them—even placing screenshots of these articles into her Response. She certainly relies on each of these articles for the truth of the matter asserted. None of these articles are admissible into evidence. *Cody v. Harris*, 409 F.3d 853 (7th Cir. 2005) (citing Fed. R. Evid. 801(c) ("The article is clearly hearsay . . . . Cody is offering the article as proof that Harris made the accusation.")). *See also Gbur v. City of Harvey*, 835 F. Supp. 2d 600 (N.D. Ill. 2011); *Chi. Firefighters Local 2 v. City of Chicago*, 249 F.3d 649, 654 (7th Cir. 2001); *LaFlamboy v. Landek*, No. 05 C 4994, 2008 U.S. Dist. LEXIS 93368 (N.D. Ill. Nov. 17, 2008).

Given that much of Ms. Nieves's Response is based on unauthenticated hearsay contained in these news articles, the Court should reject any reference to these news articles. However, even if these articles were admissible, they add nothing to the Court's analysis.[1] That, for example, someone else labeled Mr. Lawrence the "father of Carmel swimming" has nothing to do with whether the Subpoena seeks any relevant evidence. [Dkt. 102-2 at 2].[2] That Mr. Lawrence gave commentary reflecting on his time as a coach at Carmel or that Mr. Lawrence provided commentary on his assessment of Carmel's swimming teams has nothing to do with whether his involvement with Carmel continued over time.

Indeed, it did not, and it could not: Mr. Lawrence did not have any formal association with Carmel after the Spring of 1995, and the only interactions he had were occasional pep

---

[1] If anything, the newspaper article inserted on page 6 of Ms. Nieves's Response supports Mr. Lawrence's contention that he voluntarily left his employment with Carmel. The article states that "school officials have no knowledge of any incidents or problems during Lawrence's time as coach." [Dkt. 102 at 6].

[2] Notably, two of the newspaper articles are barely, if at all, legible. [Dkt. 102-2; Dkt. 102-3].

4

talks that ended at least 15 years ago, or over 10 years before the events giving rise to this lawsuit. (Please see the attached Exhibit C, Supplemental Declaration of Ray Lawrence, ¶¶1–2).

>   **2. Mr. Lawrence did not create a culture of sexual abuse at Carmel, and his impact—if any—has long since lapsed as the perpetrator himself does not know of Mr. Lawrence and did not act pursuant to any alleged "culture."**

Ms. Nieves claims that Mr. Lawrence's testimony is "particularly important given his creation of the swimming culture at Carmel and his own sexual misconduct with athletes while there." [Dkt. 102 at 4]. Again, Ms. Nieves provides no evidence to support this disparaging statement. In fact, the inadmissible hearsay news articles cited by Ms. Nieves reference a legacy of winning swimming championships, not the culture of abuse alleged by Ms. Nieves.

Ms. Nieves claims that other Carmel coaches after Mr. Lawrence left continued the culture Mr. Lawrence started. First, Mr. Lawrence did not know and never worked with Richard Rice, one of the former coaches identified by Ms. Nieves. (Ex. C, Suppl. Lawrence Decl.¶12). While Mr. Lawrence worked with Tony Young for approximately 3 years between 1991 and 1994, when Mr. Lawrence was coaching the men's swimming team at Carmel, and Mr. Young coached the women's team at Carmel along with the Carmel Swim Club, Mr. Lawrence had no knowledge of or involvement in the criminal allegations against Mr. Young. Those allegations apparently involved a failure to report an incident between students wholly unrelated to Ms. Nieves' allegations in this case. (Ex. C¶¶13–16). Mr. Lawrence had left Carmel by the time of the incident involving Mr. Young. (Ex. C¶14). Most

significantly, Mr. Lawrence did not even know the perpetrator involved in this case, John Goelz. (Ex. C¶11).

Even the perpetrator himself in this case, Mr. Goelz, affirmed as much at his deposition. (Please see the attached Exhibit E, Deposition Transcript of John Goelz, at 71:14–71:24). Indeed, Mr. Goelz testified at length he had **no** knowledge of any "culture at Carmel Swim Club that allowed for sexual abuse or rape" before coming to Indiana; had **no** knowledge related to "anything about Carmel High School's swim team having a culture of allowing sexual abuse and rape" before coming to Indiana; and after coming to Indiana, still **never** heard "anything about the Carmel High School swim team having a culture of allowing sexual abuse and rape." (Ex. E at 73:3–74:15). Tellingly, Ms. Nieves fails to provide any of this testimony in her Response. There is simply no connection between Mr. Lawrence and the events giving rise to this lawsuit, and the Court should reject Ms. Nieves' attempts to manufacture one.

Ms. Nieves also claims that "[m]ultiple kids, *that we know about*, were badly hurt and abused by their coaches along the road to these championships, including by the architect himself: Ray Lawrence." [Dkt. 102 at 5] (emphasis in original). Yet, Ms. Nieves provides no evidence of or the identity of these "multiple kids." She does not state when these alleged incidents occurred or the circumstances giving rise to such allegations. If Ms. Nieves is relying on incidents involving Tony Young and Richard Rice, both such incidents occurred years after Mr. Lawrence departed from Carmel High School and at least 17 years before any incident involving Ms. Nieves. *See* Pl.'s Exs. C, D to Response to Motion to Quash, Dkts. 102-3, 102-4; Dkt. 79 at 4-5 (detailing the employment tenure of the identified individuals).

6

In short, Ms. Nieves has not demonstrated or even alleged that any prior incidents involving Richard Rice and Tony Young were committed because of or pursuant to any particular policy, custom, or practice—or "culture"—that could or may involve Mr. Lawrence's time at Carmel High School over 25 years ago. Simply put, Ms. Nieves has failed to provide the type of evidence necessary for the Court to conclude that Ray Lawrence's testimony could bear on any subsequent incidents or the events that are at issue in the instant lawsuit. This evidence is necessary before Ms. Nieves can go on a fishing expedition with the Subpoena to Mr. Lawrence.

### 3. Mr. Lawrence's ban from USA Swimming occurred decades after his tenure at Carmel High School and does not itself provide grounds to subpoena Mr. Lawrence in this case.

Ms. Nieves cites a lifetime ban imposed against Mr. Lawrence by USA Swimming in 2011 to support her claim that Mr. Lawrence should be deposed in this case. As an initial matter, the USA Swimming website indicates that the suspension was based on rules that were in place between 1985 and 1994, not anywhere close to 2011. (Please see the attached Exhibit F, Declaration of Courtney E. Endwright, ¶¶11-12).

The statement on USA Swimming's website does not tell the whole story. When Mr. Lawrence had already retired from Speedway Schools and was in his last year of administering the Indiana Online Academy, he was notified by USA Swimming that a complaint had been made against him. (Ex. C, Suppl. Lawrence Decl.¶¶5–6). Mr. Lawrence had not been a member of USA Swimming since at least 1995 and had not been involved with a swimming program since 1994 when he stopped coaching the men's swimming team

7

at Carmel. (Ex. C¶¶1–4). Mr. Lawrence was not provided with a copy of the complaint nor the identity of the complainant. (Ex. C¶7).

Mr. Lawrence learned that USA Swimming would only place an asterisk next to his name since the allegations did not violate its Code of Conduct in place when Mr. Lawrence was a member. (Ex. C¶8). Knowing this and because Ms. Lawrence had no need for USA Swimming's credentialing since he had not been involved in coaching for at least 16 years at that point, he decided not to spend the time and resources to seek a hearing on the complaint. (Ex. C¶9). Thus, an asterisk was placed next to his name on the swimming ban list. *See* Exhibit 1 to Ex. F, Endwright Decl., USA Swimming – Individuals Permanently Suspended or Ineligible from August 31, 2012. Not until Mr. Lawrence received the Subpoena in this case did he learn that USA Swimming's website now states "Sexual Misconduct" next to his name on the ban list. (Ex. C¶10; please see the attached Exhibits 1 through 3 to Ex. F, Endwright Decl., archives of USA Swimming's Individuals Permanently Suspended or Ineligible lists).

It is clear that Ms. Nieves has no evidence to support her allegations—except rumors and inadmissible hearsay. Fundamentally, Ms. Nieves offers no evidence to dispute that Mr. Lawrence's employment and his affiliation with Carmel voluntarily ended over 20 years before the events giving rise to this lawsuit. She has not demonstrated that anything Mr. Lawrence did or did not do had any impact on or involved the events that happened in 2018 involving Ms. Nieves. Thus, the Court should quash the Subpoena in its entirety.

**C. Despite lofty accusations of misrepresentations by Mr. Lawrence, Ms. Nieves failed to actually identify any misrepresentations in Mr. Lawrence's Declaration. This is because Mr. Lawrence was fully truthful in this Declaration.**

Mr. Lawrence averred that he has not "had any formal association with Carmel, including Carmel High School, since the Spring of 1995," and he has not had "any formal association with Carmel Swim Club or USA Swimming generally since approximately 1993." [Ex. B, Lawrence Decl., Dkt. 98-2¶¶7–8]. Ms. Nieves asserts that Mr. Lawrence somehow "misrepresents his association with Carmel Swim Club and USA Swimming generally" by these statements. [Dkt. 102 at 3]. Yet, Ms. Nieves has offered absolutely no support for this accusation.

From what Mr. Lawrence understands from Ms. Nieves's confusing train of thought, Ms. Nieves surmises that since Mr. Lawrence was not banned from USA Swimming until March 2011, his membership with USA Swimming could not have lapsed until close to that time. *See* Dkt. 102 at 7 ("Note that Lawrence was not banned until March 2011 – prior to that time, presumably, he was a member of USA Swimming, quite contrary to his sworn statement that he had no 'formal association with . . . USA Swimming generally since approximately 1995.'").

As with any organization, memberships lapse when they are not renewed. Mr. Lawrence's membership with USA Swimming lapsed by 1995 because he did not renew his membership. (Ex. C, Suppl. Lawrence Decl.,¶¶3-4). Mr. Lawrence has and had no control over USA Swimming's actions in 2011 even though he had not been a member since at least 1995 and possibly earlier. No misstatement of any kind occurred, and Ms. Nieves has offered absolutely no evidence to dispute this testimony, only speculation and surmise.

9

Ms. Nieves also does not provide specific evidence to support her assumption that Mr. Lawrence misrepresented his association with Carmel High School after the Spring of 1995. There is simply no evidence to dispute that Mr. Lawrence ended his formal association with Carmel in the Spring of 1995. That Mr. Lawrence was quoted in news articles about Carmel, which are inadmissible hearsay anyway, does not prove that Mr. Lawrence's Declaration is false in any way. At no point do any of the news articles cited by Ms. Nieves show that Mr. Lawrence's employment or formal involvement with Carmel continued at any point after 1995.

Thus, Ms. Nieves simply offers no evidence that Mr. Lawrence was, in any way, formally involved with Carmel or employed by Carmel after 1995. This is because Mr. Lawrence has not had any association with Carmel since 1995 beyond a few, sporadic pep talks, which occurred more than 15 years ago.

**D.     Ms. Nieves does not accurately represent Carmel's discovery during this process—in fact, Ms. Nieves's counsel admitted that discovery issues have been resolved, yet now Ms. Nieves raises these discovery issues again to support her conspiracy theory that evidence is being covered up—evidence that is between 25 and 42 years old.**

Although Ms. Nieves asserts that "Ms. Nieves cannot get the information from Carmel itself" in this case [Dkt. 102 at 7], Ms. Nieves's own counsel's representations to this Court belie this contention. Specifically, Ms. Nieves's own counsel agreed, "following the conference with the Court on December 4, 2020," that "the two [relevant discovery] issues presented had been resolved 'to the satisfaction of both parties.'" (Please see the attached

Exhibit D, Declaration of Jessica Williams Schnelker, ¶¶6–7 [citing Dkt. 81¶2]).[3] Furthermore, Carmel has apparently produced "thousands of documents in this case, which amounts to nearly 25,000 pages of records," so Ms. Nieves's alleged difficulty in obtaining documents from Carmel appears to be baseless. [Dkt. 104 at 3].

Apparently now reaching for any justification for the overly burdensome Subpoena, Ms. Nieves now points to a total of three recommendation letters from Carmel employees that were apparently contained within Mr. Lawrence's personnel file with Speedway but not in his personnel file with Carmel.[4] Ms. Nieves suggests these documents were not produced by Carmel because Carmel is withholding them. But Carmel can only produce documents in its possession, and it does not have these documents in Mr. Lawrence's personnel file. (Ex. D, Schnelker Declaration¶¶8-9). Moreover, these documents are not even on Carmel letterhead—they were submitted with an application for an administrative program at Butler University. (Ex. C, Suppl. Decl. Lawrence¶18). *See* Dkt. 102-5. These recommendation letters were submitted to Butler University Bureau of Educational Placement, a third party, over 27 years ago. (Ex. C¶18). On the face of these documents, it appears that Butler—not Carmel—was responsible for maintaining these documents. *See* Dkt. 102-5.

Ms. Nieves further engages in unbridled speculation, without the support of anything but Ms. Nieves's counsel's "information and belief" that "in 2016 . . . Carmel invited

---

[3] One of the discovery disputes before the Court involved the production of personnel file materials from Carmel Clay Schools involving Mr. Lawrence. (Ex. D, Schnelker Declaration¶6).

[4] Ms. Nieves inaccurately states that "Carmel wrote glowing letters of recommendation for Lawrence to become a school administrator, despite knowing the real reasons for Lawrence's departure from Carmel." [Dkt. 102 at 7–8]. These letters were written in 1993 and 1994 before Mr. Lawrence voluntarily left his employment with Carmel in 1995. *See* Dkt. 102-5.

11

Lawrence to be a guest of honor at a celebration of the Carmel Clay Girls Swim Team." [Dkt. 102 at 7]. What "information and belief" led Ms. Nieves to this bald assertion is not identified by Ms. Nieves or her counsel. Nevertheless, there is no truth to this unsupported assertion—Mr. Lawrence neither received nor was he aware of any such invitation, and he did not attend this event. (Ex. C¶17).

Ms. Nieves has no basis for pursuing this non-party Subpoena, as the documents and information sought by the Subpoena have absolutely no relation to the parties' claims or defenses in this lawsuit. The Court should reject Ms. Nieves's attempts to manufacture false bases for continuing to pursue this Subpoena. The non-party Subpoena to Mr. Lawrence is therefore unduly burdensome and should be quashed.

### III.    CONCLUSION

Because the non-party Subpoena issued to Mr. Lawrence does not even offer "the possibility of mere relevance" to this case, the Court should quash the Subpoena in its entirety. *Methodist Health Servs. Corp. v. Osf Healthcare Sys.*, No. 13-1054, 2014 U.S. Dist. LEXIS 203122, at *5-6 (C.D. Ill. Jan. 8, 2014).

Accordingly, non-party Raymond M. Lawrence, by counsel, respectfully requests that the Court quash the Subpoena in its entirety. Mr. Lawrence further requests all other just and proper relief.

Respectfully submitted,

*s/ Sandra L. Blevins*
Sandra L. Blevins, Attorney No. 19646-49
Courtney E. Endwright, Attorney No. 30557-49
*Attorneys for Nonparty Raymond M. Lawrence*

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 26th day of April, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

                    *s/ Sandra L. Blevins*
                    Sandra L. Blevins

BETZ + BLEVINS
One Indiana Square, Suite 1660
Indianapolis, IN 46204
Phone: (317) 687-2222
Fax: (317) 687-2221
Email: litigation@betzadvocates.com